UNITED STATES of America, Appellee,

v.

Gary NERLINGER and Robert Varipapa, Defendants–Appellants.

Nos. 64, 267, Dockets 88–1081, 88–1094.

United States Court of Appeals, Second Circuit.

Argued Sept. 19, 1988.

Decided Dec. 2, 1988.

---

David T. Grudberg, New York City (Mark F. Pomerantz, Fischetti Pomerantz & Russo, New York City, of counsel), for defendant-appellant Gary Nerlinger.

Helen Coady, The Legal Aid Society, Federal Defender Services Unit, New York City, for defendant-appellant Robert Varipapa.

Robert L. Plotz, Asst. U.S. Atty. for S.D. New York, New York City (Rudolph W. Giuliani, U.S. Atty. for S.D. New York, Linda Imes, Asst. U.S. Atty. for S.D. New York, New York City, of counsel), for appellee.

Before PIERCE and WINTER, Circuit Judges, and STEWART, District Judge.*

WINTER, Circuit Judge:

Appellants Gary Nerlinger and Robert Varipapa appeal from their convictions on one count each of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (1982) and a total of sixteen counts, seven against Nerlinger and nine against Varipapa, of mail fraud in violation of 18 U.S.C. § 1341 (1982). Nerlinger and Varipapa each moved for severance pursuant to Fed. R.Crim.P. 14. The district court denied these motions, and each appellant claims that the spillover effect from the joint trial prejudiced his respective defense. We disagree. In addition, Nerlinger claims that the admission against him of hearsay statements made by coconspirators after Nerlinger withdrew from the conspiracy was error. Although we agree that Nerlinger did withdraw from the conspiracy before the hearsay statements were made, the error was harmless. We therefore affirm both convictions.

## BACKGROUND

The evidence presented by the government at the defendants' trial portrayed the following events. In early 1982, Tony DeAngelis became the head trader for the New York office of First Commodity Corporation of Boston, Inc. ("FCCB"), and as such, was authorized to execute orders for commodity-futures contracts on various exchanges.

A commodity-futures contract is an agreement either to purchase or to sell certain goods at a future date. Because estimates of future supply and demand for subject goods change over time, the value of commodity-futures contracts fluctuates. An investor may thus take advantage of such fluctuations by selling contracts before their date of execution on an exchange such as the Commodities Exchange in New York.

FCCB offered its customers two types of commodity-futures accounts pertinent to this appeal, both of which allowed discretionary trading by FCCB: (i) the round-turn account; and (ii) the long-term forward ("LTF") account. Under a round-turn account, an investor typically paid FCCB a commission of $100 per trade. An LTF account, by contrast, required a one-time, up-front commission of thirty-nine percent on a minimum investment of $10,-000. The provisions governing LTF accounts limited investors to only one contract per $5,000 invested in the particular LTF account. Profits resulting from trading on the LTF account, however, were often reinvested in the account after the deduction of an additional thirty-nine percent fee. If such a reinvestment amounted to $5,000, the investor would be entitled to the inclusion of an additional contract in that LTF account. The acquisition of a contract through reinvestment was referred to as an "equity buy".

As the head trader for the New York office, DeAngelis was authorized to trade "in bulk"—permitted to place orders for a commodity at the exchange without those orders being assigned to an account of a particular FCCB customer. At the end of the day, he would then assign the trades to various customers' accounts. Soon after becoming FCCB's chief New York trader, DeAngelis, who had a gambling problem that caused him to need cash on a seemingly continual basis, chose to assign profitable trades to accounts that were close to earning $5,000 in profits. This enabled the salesmen on those accounts to cause an "equity buy" in the account and thereby earn an additional thirty-nine percent commission. Those salesmen in turn paid DeAngelis $50 for each "equity buy" he diverted to them.

In July 1982, DeAngelis and Stephen Donovan, a salesman in FCCB's New York office, developed a new scheme to generate cash. Donovan agreed to open an account at FCCB, and DeAngelis in turn guaran-

* The Hon. Charles E. Stewart, *District Judge,* United States District Court for the Southern District of New York, sitting by designation.

teed the profitability of the account in exchange for one-half of the profits. This guarantee was based on DeAngelis's ability to assign profitable trades to that account. Necessarily, this diversion reduced the profits to FCCB's regular customers.

At the end of July 1982, Donovan opened an account in the name of his sister-in-law, Tina D'Erasmo. He did so in order to avoid FCCB's rule against a salesperson having an account at FCCB. DeAngelis's diversion of profitable trades to this account produced $29,000 in profits in the six months between August 1982 and January 1983. Subsequently, Donovan opened a second account, also in the name of a sister-in-law, Emily LaRose. This latter account produced profits of $27,000 between October 1982 and June 1983. The profits from both accounts were split between Donovan and DeAngelis.

Sometime between the opening of the D'Erasmo account and the LaRose account, Gary Nerlinger, another FCCB salesman, became curious about DeAngelis's relationship with Donovan. Eventually, DeAngelis revealed to Nerlinger his agreement with Donovan and invited Nerlinger to participate in the same scheme. In August 1982, Nerlinger directed his then fiancee, later wife, and later yet his adversary in a bitter divorce, Linda Lempel, to fill out an account application at FCCB under her middle name, Ann. Nerlinger told Lempel to exaggerate on the application both the size of her income and the nature of her employment. In September 1982, Nerlinger opened the "Ann Lempel" account with a deposit of $5,000.

DeAngelis thereafter diverted profitable trades to the Lempel account. He also occasionally "busted" a profitable trade out of a legitimate customer's account and credited it to the Lempel account. Unlike the manipulation involving the discretionary assignment of trades, "busting" a trade out of an account involves taking a trade out of one account and placing it in another account. By September 23, 1982, after only two weeks of trading, Lempel had received a check for profits of $11,890 from FCCB. After Lempel deposited the check, Nerlinger split the proceeds with DeAngelis in cash. For the next several months DeAngelis continued to divert profitable trades to the Lempel account and received one-half of the profits.

In March 1983, Nerlinger decided to leave FCCB because of problems with his superiors unrelated to his activities with DeAngelis. In anticipation of his move, Nerlinger asked DeAngelis if the Lempel account could remain open after Nerlinger's departure from the firm. DeAngelis replied that that would not present any problems. At this time Nerlinger told his wife that they would be receiving some big checks from the FCCB account, but that they would not be doing it much longer. Subsequently, DeAngelis busted several trades into the Lempel account and, as a result, Nerlinger and Lempel received checks from FCCB in the amounts of $10,750 and $20,250 on March 11 and March 25, 1983 respectively. Nerlinger then closed the Lempel account. In all, the Lempel account had produced over $62,000 in profits in the less than seven months between September 1982 and March 1983. It was the only FCCB account serviced by Nerlinger that showed a profit during that period.

The closing of the Lempel account did not conclude DeAngelis's fraudulent operation at FCCB. In addition to the Lempel, D'Erasmo and LaRose accounts, the evidence showed that DeAngelis diverted winning trades into several other accounts in which he shared the profits. One of these was in the name of Joseph Giannone, a man DeAngelis had met at a card game, in an account under Giannone's name. As the salesman assigned to the Giannone account, appellant Robert Varipapa noticed its unusual profit record compared to other accounts (which showed no profit) and asked DeAngelis what was going on. Ultimately, DeAngelis explained how he could guarantee an account's profitability by manipulating the assignment of trades. He offered to include Varipapa in the scheme if Varipapa opened an account at FCCB under an assumed name. Varipapa thereupon opened an account with $10,000 under the name of his then girlfriend, later wife,

Theresa Tedeschi. According to the agreement between DeAngelis and Varipapa, DeAngelis was to receive one-third of the profits produced by the Tedeschi account. Between September 1983 and November 1983 those profits totaled approximately $29,000.

Immediately after the opening of the Tedeschi account, Tedeschi mentioned it to George Tackett, a business associate of her employer. Tedeschi explained that it was a "no-lose account and [that Tackett] should get involved in it." Tackett became interested and arranged a meeting with Varipapa. At that meeting Tackett told Varipapa that Tackett wanted to "open up an account exactly the way that [Tedeschi] had." Varipapa agreed but requested an initial account balance of $51,600. Varipapa wanted this amount because it reduced the difficulty of managing the "guaranteed-profit" account and would aid him in his bid to be salesman of the year. At a subsequent meeting attended by Varipapa, Tackett and Frank Lanziano (Tedeschi's employer), Varipapa explained how the account worked. He stated that "there was an inside man who was a trader, Tony DeAngelis, who manipulated the account in such a fashion as to guarantee that we would make money." In addition, the parties negotiated the terms of the guaranteed-profit account. Eventually "[they] agreed that 40 percent would be paid to Robert Varipapa who would in turn pay Tony DeAngelis and 60 percent would be paid to [Tackett and Lanziano]." On September 28, 1983, Tackett and Lanziano opened the account by depositing a certified check for $51,600 with FCCB.

On October 31, 1983, FCCB issued a check for $24,200 to Tackett as the profits of the guaranteed-profit account. Varipapa told Tackett that DeAngelis had a financial problem and consequently that the profits had to be split 50–50, rather than 60–40 as originally agreed. Tackett ultimately accepted the proposal. Varipapa and Tackett then arranged to meet with Lanziano and DeAngelis. Tackett brought $12,100 (fifty percent of the aforementioned $24,200 profit) to the meeting and distributed it to Varipapa and DeAngelis.

The four men then discussed the mechanics of trading. Varipapa and DeAngelis explained that "[DeAngelis] would manipulate the trades in such a fashion as to put [Tackett and Lanziano] on the winning side of a trade. Whether it was gold or petroleum, or whatever the commodity that they were buying or selling was, [Tackett and Lanziano] would always be on the winning side of the trade." Tackett and Lanziano were satisfied, and the meeting was adjourned.

One week later, on November 14, 1983, Tackett received a check from FCCB for $47,000. Tackett called Varipapa and discovered that DeAngelis had once again encountered financial difficulties and had issued the check in order to obtain his cut of the proceeds. Tackett agreed to pay DeAngelis $8,500. Tackett and Lanziano each then opened an additional account at FCCB. These accounts were in their respective wives' names and had initial balances of $21,500 each. Varipapa subsequently requested that either Tackett or Lanziano aid him in his quest to be FCCB's salesman of the year by depositing $4,300 into one of the existing accounts. They refused to put up their own money but did agree to deposit $4,300 of Varipapa's money into the account bearing Lanziano's wife's name. No further checks were issued in any of these three accounts.

Varipapa opened one further bogus account under the name of Catherine Palomba. It was apparently opened on October 31, 1983 with an initial balance of $21,500 and closed on November 17, 1983. By the date of closing, its balance had grown to $26,340.60, representing a profit of $4,840.60.

On December 9, 1983, Varipapa, DeAngelis, Donovan and others were fired by FCCB. Varipapa called Tackett and informed him of both the firings and the likely indictments.

Nerlinger and Varipapa both testified in their own defense. Neither challenged the fact that DeAngelis's conduct was fraudulent and manipulative. Each denied, however, that they knew how DeAngelis was

generating profitable trades for their accounts. Both maintained this stance in the face of the established facts that their accounts were in the names of others and that the other accounts they serviced as salesmen at FCCB showed no profits. Varipapa denied any profit-sharing with DeAngelis but admitted that he did not report his profits on his tax returns. The jury disbelieved them and convicted on all counts.

## DISCUSSION

This appeal raises two issues: (i) whether the district court erred in denying the defendants' motions for severance; and (ii) whether the district court erred by admitting against Nerlinger testimony of hearsay statements by various participants in the scheme made between March 1983 (when Nerlinger left FCCB) and December 9, 1983 (when FCCB fired Donovan, DeAngelis and Varipapa) as declarations by co-conspirators admissible under Fed.R.Evid. 801(d)(2)(E).

### A. *Severance*

Appellants advance two arguments to support the claim that the district court erred in denying their severance motions: (i) that the prosecution produced legally insufficient evidence of appellants' participation in a single conspiracy; and (ii) that the joint trial was unduly prejudicial to their respective cases. We reject both claims.

### (i) *The Sufficiency Claim*

"Whether the evidence in a case establishes single or multiple conspiracies is a question of fact to be resolved by a properly instructed jury." *United States v. Friedman*, 854 F.2d 535, 561 (2d Cir.1988), *petition for cert. filed*, U.S.L.W. (U.S. ——, 1988) (No. 87–1134); *see also United States v. Nersesian*, 824 F.2d 1294, 1302 (2d Cir.), *cert. denied*, —— U.S. ——, 108 S.Ct. 355, 357, 98 L.Ed.2d 380 (1987), —— U.S. ——, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988). Because the jury obviously concluded that the government had proved a single conspiracy, and neither appellant challenges the correctness of Judge Keenan's charge on the multiple conspiracy

question, appellants are driven to pursue the sufficiency issue.

"In reviewing [the] contention [that the government's evidence is insufficient], we must view [that] evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and we must affirm the convictions so long as, from the inferences reasonably drawn, the jury might fairly have found [that] requisite connection beyond a reasonable doubt." *United States v. Biaggi*, 853 F.2d 89, 99 (2d Cir.1988) (citations omitted). The defendants contend, however, that the Supreme Court's decision in *Kotteakos v. United States*, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) precluded the jury from finding a single conspiracy on the basis of the evidence presented by the government in the instant case. *Kotteakos* involved a scheme in which one Simon Brown acted as a broker for numerous individuals in obtaining from financial institutions loans that were subsequently "offered to the Federal Housing Administration for insurance upon applications containing false and fraudulent information." *Kotteakos*, 328 U.S. at 752, 66 S.Ct. at 1241. The circumstances characterizing each fraudulent transaction were extremely similar, and the government originally prosecuted the case on the theory that each transaction constituted an integral part of one large conspiracy. The government analogized the scheme to a spoked wheel, with the applicants representing the "separate spokes" and Brown operating as the "common center." *Id.* at 755, 66 S.Ct. at 1243. The Supreme Court rejected that position and held that "[t]he proof ... made out a case, not of a single conspiracy, but of several, ..." *Id.*

■ Appellants argue that the scheme in the instant case is analogous to that in *Kotteakos*, and that, therefore, they cannot be found to have participated in a single conspiracy. In *Kotteakos*, however, "no connection was shown between [the defendants], other than that Brown had been the instrument in each instance for obtaining the loans. In many cases the ... defend-

ants did not have any relationship with one another, other than Brown's connection with each transaction." *Id.* at 754, 66 S.Ct. at 1242. In the present case, DeAngelis testified that both Nerlinger and Varipapa entered the fraudulent scheme only after being alerted to it by the peculiar performance of others' accounts. In addition, Tackett testified that Varipapa operated as the middleman in the opening of Tackett's and Lanziano's bogus accounts. Finally, appellants and DeAngelis were all employees of FCCB—precisely the circumstance that created the opportunity for the fraudulent scheme. The jury thus had sufficient evidence from which to infer that the appellants knew their activities were parts of a larger enterprise operated by DeAngelis.

■ The jury also had sufficient evidence before it to find that, in undertaking their fraudulent activity, Nerlinger and Varipapa "agreed on a 'common purpose.'" *United States v. Heinemann*, 801 F.2d 86, 92 (2d Cir.1986) (quoting *Kotteakos*, 328 U.S. at 769, 66 S.Ct. at 1250), *cert. denied*, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). Each agreed with DeAngelis to obtain profits through the manipulation of trades at the expense of FCCB's legitimate customers. The fact that they did not have an agreement with each other is of no consequence. "[T]here is no requirement that each member of a conspiracy conspire directly with every other member of the conspiracy." *Friedman*, 854 F.2d at 562. Nor is it dispositively relevant that Nerlinger concluded his conspiratorial activity before Varipapa's participation began. "The jury need not have concluded that the same people were involved throughout the entire period of the conspiracy in order to find one conspiracy." *United States v. Nersesian*, 824 F.2d 1294, 1303 (2d Cir. 1987). We thus conclude that the government presented sufficient evidence to support the jury's finding that the defendants were engaged in a single conspiracy.

### (ii) *Joint Trial*

We now turn to appellants' argument that the district court subjected them to a prejudicial joint trial. The defendants' initial claim is that they were improperly joined under Fed.R.Crim.P. 8(b). Fed.R. Crim.P. 8(b) states that:

> Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

■ The established rule is that a non-frivolous conspiracy charge is sufficient to support joinder of defendants under Fed.R. Crim.P. 8(b). *See, e.g., United States v. Scafidi*, 564 F.2d 633, 642 (2d Cir.1977), *cert. denied*, 436 U.S. 903, 912, 98 S.Ct. 2231, 2252, 56 L.Ed.2d 400, 413 (1978); *United States v. Pepe*, 747 F.2d 632, 652 n. 24 (11th Cir.1984); *United States v. Phillips*, 664 F.2d 971, 1016 (5th Cir. Unit B 1981), *cert. denied*, 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982). As the prior discussion demonstrates, the conspiracy charge against appellants is non-frivolous. The defendants contend, however, that their respective cases are factually distinct and, therefore, that there is no justification for a joint trial. We acknowledge that appellants were not alleged to have had any direct contact with regard to the conspiracy and that their respective acts committed in furtherance of the conspiracy occurred during chronologically distinct periods. Nevertheless, they were alleged to have participated in the same conspiracy and evidence of the central features of that conspiracy, including not inconsiderable explanations of the workings of a scheme peculiar to the arcane world of commodities trading, was relevant to both defendants. Thus, judicial economy, the central purpose for permitting joint trials, was served by joinder.

■ Appellants also claim that they were entitled to severance under Fed.R. Crim.P. 14, which provides in pertinent part that:

> If it appears that a defendant or the government is prejudiced by a joinder of

offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

"A defendant raising a claim of prejudicial spillover bears an extremely heavy burden. Indeed, a motion to sever under Rule 14 is committed to the discretion of the trial court and is 'virtually unreviewable.'" *Friedman*, 854 F.2d at 563 (citations omitted). To establish an abuse of discretion, an appellant must show more than that he would have stood a better chance of obtaining an acquittal had he had a separate trial. *United States v. Carson*, 702 F.2d 351, 366 (2d Cir.), *cert. denied*, 462 U.S. 1108, 103 S.Ct. 2456, 77 L.Ed.2d 1335 (1983). Rather, he must show that a "miscarriage of justice" has occurred. *United States v. Nersesian*, 824 F.2d at 1303 (citation omitted).

The prejudicial effect of the evidentiary "spillover" complained of by the appellants does not even approach this standard. At best it amounts to a claim that their highly implausible testimony—consisting of a "tooth fairy" defense that they were unaware that manipulation was the cause of their substantial profits notwithstanding their knowledge that profits of any kind were unique to accounts opened by salesmen in the names of others—stood a better chance of convincing a jury if told in separate trials. This hardly amounts to a miscarriage of justice, particularly in light of the overwhelming evidence of guilt of each appellant.

B. *Hearsay*

Under Fed.R.Evid. 801(d)(2)(E), "a [hearsay] statement by a coconspirator of a party during the course and in furtherance of the conspiracy" is admissible as nonhearsay. As the language of the rule indicates, once a party withdraws from a conspiracy subsequent statements by a coconspirator do not fall within this exemption. *See* 4 *Weinstein's Evidence* ¶ 801(d)(2)(E)[01], at 801–248–49 (1988); *see also United States v. Abou–Saada*, 785 F.2d 1, 8 (1st Cir.),

*cert. denied*, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986). Consequently, the propriety of the district court's admission against Nerlinger of hearsay statements made by various of the conspirators between March 1983 and December 9, 1983 depends on whether Nerlinger effectively withdrew from the conspiracy when he resigned from, and closed his account at, FCCB in March 1983. We believe he did withdraw.

■ "Withdrawal from a conspiracy requires 'affirmative action ... to disavow or defeat the purpose' of the conspiracy." *United States v. James*, 609 F.2d 36, 41 (2d Cir.1979) (citation omitted), *cert. denied*, 445 U.S. 905, 100 S.Ct. 1082, 63 L.Ed.2d 321 (1980). Nerlinger unquestionably disavowed the conspiracy when he resigned from, and closed the Lempel account at, FCCB. According to the indictment, the principal objective of the conspiracy was to defraud legitimate customers of FCCB by assigning profitable trades to the salesmen's accounts. Nerlinger's role in that scheme was to open and maintain an account at FCCB into which DeAngelis could direct trades in exchange for fifty percent of the profits. By closing his FCCB account, Nerlinger foreclosed his continuing in that role and relinquished any claim to subsequent profits.

■ The only question is whether his closing of the account constitutes an "affirmative action" in light of the rules that mere cessation of conspiratorial activity is not enough, *United States v. Borelli*, 336 F.2d 376, 388 (2d Cir.1964), *cert. denied*, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965) and that withdrawal must be accompanied by a "communication of the abandonment in a manner reasonably calculated to reach co-conspirators." *Id.* Nerlinger's closing of the account does satisfy this standard because it disabled him from further participation and made that disability known to DeAngelis. That is enough. Nothing in *Borelli* or any other case requires the hiring of a calligrapher to print formal notices of withdrawal to be served upon coconspirators. The government also

argues that Nerlinger's closing of the Lempel account was ambiguous in light of Nerlinger's question to DeAngelis as to whether Nerlinger could maintain the account after resigning from FCCB. According to the government, this inquiry reflected Nerlinger's interest in continuing to participate in the conspiracy. Even if it did, however, the closing of the account in the face of DeAngelis's invitation to continue it is an explicit withdrawal from the conspiracy. The hearsay statements should, therefore, not have been admitted against Nerlinger.

Nevertheless, any error was harmless. Nerlinger's defense was not that the alleged manipulation of trades at FCCB did not occur, but that he was not aware of it. The challenged testimony, however, concerned only the existence of the scheme and not Nerlinger's knowledge of the means by which profits accrued to the Lempel account. Because the evidence was relevant only to a matter not disputed by Nerlinger, the failure to give an instruction not to consider the evidence with regard to Nerlinger could not have affected the verdict.

AFFIRMED.