17-3691-cr(L)
United States v. Lebedev et al.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2018

Nos. 17-3691-cr(L), 17-3758-cr(Con), 17-3808-cr(Con)

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

YURI LEBEDEV and TREVON GROSS,

*Defendants-Appellants,*

ANTHONY R. MURGIO, also known as Sealed Defendant 1, MICHAEL J. MURGIO, JOSE M. FREUNDT, and RICARDO HILL, also known as Rico,

*Defendants.*[*]

Appeal from the United States District Court
for the Southern District of New York.
Nos. 15-cr-769-1, 15-cr-769-2, 15-cr-769-3 — Alison J. Nathan, *Judge.*

ARGUED: DECEMBER 5, 2018
DECIDED: JULY 26, 2019

Before: CABRANES, POOLER, and DRONEY, *Circuit Judges.*

---

[*] The Clerk of Court is directed to adopt the caption as set forth above.

Appeal from the November 1, 2017 and November 16, 2017 judgments of the United States District Court for the Southern District of New York (Alison J. Nathan, *Judge*), convicting the Defendants-Appellants, after a jury trial, of multiple counts arising out of their roles in the operation of an illegal Bitcoin exchange and a scheme to use a federal credit union for illegal purposes. They argue, among other things, that the district court made various evidentiary errors, including improperly limiting the examination of a witness called to impeach a key government witness. Defendant Lebedev further argues that insufficient evidence was presented at trial to sustain his convictions, while defendant Gross argues that the evidence presented at trial so differed from the allegations of the superseding indictment that the government impermissibly constructively amended the indictment. Defendant Gross also challenges his 60-month prison sentence and order of restitution, arguing that the court misapplied certain sentencing enhancements in calculating the Guidelines range, and abused its discretion in determining restitution. We AFFIRM.

---

TILLMAN J. BRECKENRIDGE, Pierce Bainbridge Beck Price & Hecht LLP, Washington, DC, (Eric M. Creizman, Melissa Madrigal, Creizman PLLC, New York, NY *on the brief*) *for* Defendant-Appellant Lebedev.

KRISTEN M. SANTILLO, Gelber & Santillo PLLC, New York, NY, *for* Defendant-Appellant Gross.

DANIEL S. NOBLE, Assistant United States Attorney, (Won S. Shin, Eun Young Choi, Sarah K. Eddy, Assistant United States Attorneys, *on the brief*) for Geoffrey S. Berman, United States Attorney for the Southern District of New York, New York, NY.

---

DRONEY, *Circuit Judge*:

This is a consolidated appeal of two defendants convicted in a joint jury trial of offenses arising out of their roles in an illegal Bitcoin exchange and a scheme to use a federal credit union for illegal purposes.[1] Yuri Lebedev was convicted of wire fraud in violation of 18 U.S.C. § 1343, bank fraud in violation of 18 U.S.C. § 1344, conspiracy to commit wire and bank fraud in violation of 18 U.S.C. § 1349, and making corrupt payments with the intent to influence an officer of a financial institution in violation of 18 U.S.C. § 215(a)(1). Trevon Gross was convicted of receiving corrupt payments as an officer of a financial institution in violation of 18 U.S.C. § 215(a)(2). Both Lebedev and Gross were also convicted of conspiracy in violation of 18 U.S.C. § 371.

Lebedev and Gross appeal their judgments of conviction, raising various constitutional and evidentiary challenges. Gross also appeals the district court's application of several provisions of the Sentencing Guidelines in imposing his sentence and his order of restitution.

---

[1] This appeal was consolidated with that of a third defendant, Anthony R. Murgio. On May 16, 2018, the Court granted Murgio's motion to voluntarily dismiss his appeal.

## I.    BACKGROUND

The evidence presented by the government at trial concerned the activities of an internet-based Bitcoin exchange service located in Florida, known as "Coin.mx." Coin.mx's customers used the exchange to purchase Bitcoins, a digital currency, with traditional currency. Although the purpose of Coin.mx was to allow the purchase and sale of Bitcoins, Coin.mx concealed that fact from the banks and credit card companies processing its transactions.[2] Coin.mx opened bank accounts in the name of "the Collectables Club," which falsely purported to be a private members' association dedicated to collecting and exchanging memorabilia. Coin.mx also processed credit card transactions listing the Collectables Club as the merchant. Neither Coin.mx nor the Collectables Club registered with federal regulators as a money-transmitting entity or obtained state licensure for that purpose.

---

[2] Bitcoin offers users increased anonymity compared with many other virtual and traditional currencies, "mak[ing] it more difficult for law enforcement to quickly and efficiently obtain information on users . . . engaged in criminal activity." Kevin V. Tu, Michael W. Meredith, *Rethinking Virtual Currency Regulation in the Bitcoin Age*, 90 WASH. L. REV. 271, 299 (2015). Because of its susceptibility to use for illegal transactions, many banks refuse to transact with businesses dealing in Bitcoins.

Coin.mx employed Lebedev to manage information technology operations. One of Lebedev's responsibilities was to set up various Internet Protocol ("IP") addresses to make it appear to banks and payment processors that Coin.mx's transactions were legitimate Collectables Club transactions.

Eventually, Coin.mx sought control of a credit union to process its transactions.[3] In April 2014, Coin.mx representatives contacted Gross to discuss the possibility of taking control of the Helping Other People Excel Federal Credit Union ("HOPE FCU" or the "credit union"). Gross was then the chairman of HOPE FCU, as well as the head pastor of the nearby Hope Cathedral in Jackson, New Jersey.

Negotiations ensued between HOPE FCU, represented by Gross, and Coin.mx's front company, the Collectables Club, represented primarily by Anthony Murgio. Gross promised that HOPE FCU would appoint to its board of directors six members selected by the Collectables Club, giving the Collectables Club a majority of the board seats. In return, Gross required that three donations

---

[3] By taking control of a credit union, Coin.mx no longer risked being shut down by banks that uncovered the true nature of the Bitcoin transactions. Customers could open accounts at the credit union and use their accounts to buy Bitcoins from Coin.mx.

be made to Hope Cathedral: two for $15,000 each and a third for $120,000. Evidence at trial demonstrated that Gross frequently used those "donations" for personal expenses.

One of Coin.mx's other front companies, Currency Enthusiasts, made the first two $15,000 donations to Hope Cathedral. HOPE FCU's executive board nominated the six Collectables Club board members, and Gross promised that the board members they were replacing would resign at the annual meeting. Lebedev was one of the six new members nominated. At the annual meeting in June 2014, the nominees were elected, although the former board members remained on the board for a few additional months to help HOPE FCU avoid scrutiny from its regulator, the National Credit Union Administration ("NCUA").

The third donation was made by a company known as "Kapcharge." Kapcharge was a third-party payment processing company that processed electronic payments for its clients through its own accounts at financial institutions.[4] Murgio was affiliated with Kapcharge. Murgio approached Gross

---

[4] While Kapcharge did not seek to work with the credit union to process risky Bitcoin transactions, it did seek to process a large volume of transactions—in the tens of millions of dollars.

in June 2014 about allowing Kapcharge to process third-party transactions, known as automated clearing house transactions ("ACH transactions"), through an account at HOPE FCU. Kapcharge, which was a Canadian company, became a member of HOPE FCU, even though HOPE FCU's membership was limited to persons and organizations within the local community. HOPE FCU was substantially undercapitalized to process the high volume of transactions Kapcharge used it to process. Shortly after becoming a member, Kapcharge wired $120,000 to Hope Cathedral.

In addition to the "donations" used by Gross for personal expenses, Kapcharge and its co-conspirators paid Gross $12,000 in so-called "consulting fees."

Ultimately, Gross had a falling out with Murgio, Lebedev, and the other Coin.mx representatives, which resulted in Gross expelling them from the credit union and terminating their relationship.[5] Thereafter, Gross refused to

---

[5] On November 22, 2014, Gross demanded an additional $50,000 donation to the church in exchange for the resignation of the remaining board members who predated Coin.mx's takeover of the credit union. Although the remaining board members resigned, Coin.mx failed to make the $50,000 payment by Gross's deadline.

communicate or transact with the Coin.mx agents, directed them to stop wiring funds into the credit union, locked them out of computer access to their accounts, and informed them that they were not members of the credit union and thus lacked standing to call a board meeting. However, Gross continued to allow Kapcharge to process transactions through its account after Coin.mx was no longer involved in the credit union. In 2015, Kapcharge wired an additional $80,000 into credit union accounts that Gross controlled.

HOPE FCU eventually came under regulatory scrutiny from the NCUA. During the NCUA's examination of the credit union, Gross failed to disclose a number of transactions, including the "donations" that Currency Enthusiasts and Kapcharge paid to Hope Cathedral, that HOPE FCU had opened a branch in Florida, and that Kapcharge was paying the salary of the credit union's new CEO and the legal fees of Gross and the credit union. Gross further misrepresented that Kapcharge had an office in New Jersey that qualified it for membership in the credit union, and failed to disclose Coin.mx agents' email accounts after the NCUA requested all of the credit union's email accounts. NCUA placed HOPE FCU into a conservatorship in October 2015.

A superseding indictment was filed on December 22, 2016, in the United States District Court for the Southern District of New York. Following a four-week jury trial, Murgio, Lebedev, and Gross were convicted of all counts on March 17, 2017. Following the denial of post-trial motions, Lebedev was sentenced to 16 months' imprisonment, supervised release, and forfeiture. Gross was sentenced to 60 months' imprisonment and three years' supervised release. Lebedev and Gross were ordered to pay $126,771.82 in restitution jointly and severally with their convicted codefendants.

Lebedev and Gross appealed their judgments of conviction. Gross, but not Lebedev, also challenges his sentence on appeal.

**II.    ANALYSIS**

We consider Lebedev's and Gross's claims on appeal in turn.

**A.    Lebedev's Claims on Appeal**

   1.    *Sufficiency of the Evidence*

Lebedev challenges the sufficiency of the evidence underlying his convictions for wire fraud under 18 U.S.C. § 1343, bank fraud under 18 U.S.C. § 1344, and conspiracy to commit wire and bank fraud under 18 U.S.C. § 1349.

9

We review *de novo* a challenge to the sufficiency of the evidence underlying a criminal conviction. *United States v. Corbett*, 750 F.3d 245, 250 (2d Cir. 2014). We "view the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012) (internal quotation marks omitted). "[W]e will uphold the judgments of conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

### a. Wire Fraud

Lebedev argues that there was insufficient evidence that he committed wire fraud because his role in Coin.mx's scheme—deceiving financial institutions concerning the nature of Coin.mx's business—did not harm or risk harming those financial institutions.

The elements of wire fraud are "(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the . . . wires to further the

10

scheme." *United States v. Binday*, 804 F.3d 558, 569 (2d Cir. 2015) (internal quotation marks omitted). "Since a defining feature of most property is the right to control the asset in question, we have recognized that the property interests protected by the . . . wire fraud statute[] include the interest of a victim in controlling his or her own assets." *Id.* at 570 (alteration omitted) (quoting *United States v. Carlo*, 507 F.3d 799, 802 (2d Cir. 2007)). For this reason, a wire fraud charge under a right-to-control theory can be predicated on a showing that the defendant, through the "withholding or inaccurate reporting of information that could impact on economic decisions," deprived "some person or entity . . . of potentially valuable economic information." *United States v. Finazzo*, 850 F.3d 94, 108 (2d Cir. 2017) (internal quotation marks omitted).

At trial, the government presented testimony from witnesses to establish the significance of Coin.mx's misrepresentations about the nature of its business, including Erika Heinrich, who worked in the fraud investigations group at Chase Bank USA ("Chase"). Heinrich testified that Chase decides whether to process pending credit card transactions based in part on information it receives about the merchant. Chase evaluates regulatory risk, including potential fines for doing

business that is illegal, as well as economic risk posed by fraudulent transactions, and considers transactions with money services or money-transmitting businesses to carry a higher risk of fraud.

The evidence at trial demonstrated that Coin.mx was a money service business that was both unlawful and carried a higher risk of fraudulent transactions. The evidence also showed that Lebedev's role in Coin.mx's scheme was to disguise Coin.mx's Bitcoin transactions through front entities such as the Collectables Club, so the institutions processing those transactions would be more likely to process and approve them. On this basis, a reasonable jury could conclude that Lebedev deprived the financial institutions of the right to control their assets by misrepresenting potentially valuable economic information.

b. Bank Fraud

Lebedev also argues that the government failed to prove he committed bank fraud because he did not intend to defraud either the bank or the customers who purchased Bitcoin. He argues that because Coin.mx's customers willingly purchased Bitcoin, the banks were not deprived of any property interest in the customers' accounts.

12

Bank fraud is defined in relevant part as "a scheme or artifice—(1) to defraud a financial institution; or (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises." 18 U.S.C. § 1344. Lebedev was indicted and convicted under § 1344(2). Subsection (2) requires that the defendant intend to obtain a financial institution's property, and that the "envisioned result . . . occur by means of false or fraudulent pretenses, representations, or promises," but does not require that "a defendant have a specific intent to deceive a bank." *Loughrin v. United States*, 573 U.S. 351, 356–57 (2014) (internal quotation marks omitted).

As discussed above, there was sufficient evidence showing that Lebedev caused false information to be sent to financial institutions to disguise the fact that their customers were transacting business with an unregistered Bitcoin exchange. Moreover, he did so with the intent to obtain funds under those institutions' custody and control; namely, funds in the customers' accounts. In addition, by approving credit-card transactions, banks advanced Coin.mx their own funds that

13

would later be paid back by customers. On these bases, a reasonable jury could conclude that Lebedev violated 18 U.S.C. § 1344(2).

* * *

Accordingly, sufficient evidence supported Lebedev's convictions for wire fraud, bank fraud, and conspiracy to commit wire and bank fraud.

**B.** **Gross's Claims on Appeal**

1. *The District Court's Evidentiary Rulings*

Gross challenges several evidentiary rulings the district court made at trial. Lebedev joins one such challenge, as noted below. We review evidentiary rulings by the district court for abuse of discretion. *United States v. Litvak*, 808 F.3d 160, 179 (2d Cir. 2015).

a. Testimony of John Rollins

First, Gross challenges the district court's decision to admit the testimony of John Rollins, which he contends was expert testimony that did not comply with the prior notice requirement of Federal Rule of Criminal Procedure 16.

Rollins is an accountant and litigation consultant whom the government retained in connection with its investigation into Coin.mx and HOPE FCU.

14

Rollins was not identified before trial as an expert witness, and no expert report was provided to the defense pursuant to Federal Rule of Criminal Procedure 16(a)(1)(G). Rather, he was identified by the government as a witness who would summarize various financial records.

At trial, Rollins testified about deposits made by the Collectables Club and Kapcharge into Hope Cathedral's bank account and withdrawals made by Gross from the same account to pay for Gross's personal expenses. Rollins testified that the funds Gross withdrew were the same funds that the Collectables Club and Kapcharge had deposited. In effect, he testified that Gross used some of the purported donations to the church from the Collectables Club and Kapcharge for his own expenses.

Rollins based his testimony on an accounting methodology referred to as "first-in-first-out" or "FIFO." The FIFO methodology assumes that the first funds deposited into an account are the funds used to pay for the first withdrawals from the account. Rollins testified that FIFO was only one of several methods he could have used, but the government instructed him to use it. He also testified

15

that "intuitively, [FIFO] makes sense" in light of "how most people handle their finances." App'x 3036.

After Rollins testified that the method "makes sense," defense counsel objected that he was giving an expert opinion, and the district court expressed concern that Rollins had improperly opined that FIFO was the correct accounting method for analyzing payments of Gross's expenses. The district court allowed Rollins to testify using the FIFO methodology after Rollins clarified that the government had specifically directed him to use it. The court also later instructed the jury that Rollins was not an expert witness and that they should not rely on his testimony to establish that using FIFO was proper.

Under Federal Rule of Evidence 702, expert witnesses provide opinions when "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). By contrast, summary witnesses may testify using "a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court." Fed. R. Evid. 1006; *see also Fagiola v. Nat'l Gypsum Co. AC & S, Inc.*, 906 F.2d 53, 57 (2d. Cir. 1990)

16

(explaining a summary witness's role as providing "foundation testimony connecting [a summary] with the underlying evidence summarized").

The district court did not abuse its discretion by admitting Rollins's testimony. Once the court clarified to the jury that Rollins was not endorsing the FIFO methodology, it was within its discretion to conclude that Rollins's application of the method was not an expert opinion but rather merely a summary of the relevant financial records. The jury could have applied the assumption inherent in the FIFO methodology to the financial records without Rollins's testimony. The district court was thus within its discretion to determine that Rollins's testimony did not constitute expert testimony and did not violate Rule 16's notice requirement.

### b. <u>Co-conspirator Hearsay Testimony</u>

Next, Gross challenges the admission of hearsay statements by Coin.mx agents under Federal Rule of Evidence 801(d)(2)(E) that he contends were made after he had withdrawn from the conspiracy. Specifically, Gross contends that the district court erroneously admitted inculpatory messages sent between Coin.mx's agents after he had a falling out with them.

Under the co-conspirator exception to the hearsay rule, the government may offer hearsay statements "made by the [defendant's] co-conspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). However, "[o]nce a party withdraws from a conspiracy subsequent statements by a co-conspirator do not fall within this exemption." *United States v. Nerlinger*, 862 F.2d 967, 974 (2d Cir. 1988). Withdrawal "requires affirmative action . . . to disavow or defeat the purpose of the conspiracy." *Id.* (internal quotation marks omitted). "That members of a conspiracy have had a disagreement or a falling out is not, however, sufficient to establish withdrawal from the conspiracy." *United States v. James*, 712 F.3d 79, 106 (2d Cir. 2013); *see also United States v. Berger*, 224 F.3d 107, 118 (2d Cir. 2000) ("[R]esignation from a criminal enterprise, standing alone, does not constitute withdrawal as a matter of law . . . ."). "[A]bsent withdrawal, a conspirator's participation in a conspiracy is presumed to continue until the last overt act by any of the conspirators." *United States v. Salmonese*, 352 F.3d 608, 615 (2d Cir. 2003) (internal quotation marks omitted). Because of the factual nature of the inquiry, "we will reverse a decision to admit co-conspirator statements only

if it is clearly erroneous." *James*, 712 F.3d at 106 (internal quotation marks omitted).

The district court ruled that there was not sufficient evidence that Gross had withdrawn from the conspiracy when the challenged co-conspirator statements were made to preclude the admission of the messages. Despite Gross's dispute with Coin.mx's agents, the court did not clearly err by concluding that the conspiracy was still ongoing on November 24, and 25, 2014, based on Gross's continued involvement with Kapcharge and Gross's continued efforts to obstruct the NCUA's examination of the credit union. Therefore, it was not error to admit the statements.

c. <u>Limitation on the Examination of Agent Beyer</u>

Next, both Gross and Lebedev contend that the district court improperly restricted their examination of a defense witness, Special Agent Emily Beyer of the United States Secret Service.

At trial, the government called Jose Freundt, an employee of Coin.mx, as a cooperating witness. On cross-examination, Freundt testified about his July 2015 meeting with Agent Beyer concerning the government's investigation into

19

Coin.mx. He testified that, at this meeting, Agent Beyer had told him Coin.mx was going to be shut down. When Freundt stated that Coin.mx still owed him compensation, Agent Beyer, according to Freundt, stated that he should "withdraw [his] salary [from a Coin.mx account] and actually give [him]self a nice little bonus." App'x 1913.

The defense sought to impeach Freundt's credibility by attacking the truthfulness of this testimony. After Freundt testified, Agent Beyer told the FBI that she would not have instructed Freundt to take any money from Coin.mx. Her statement was memorialized in an FBI report that was produced to defense counsel.

The district court then allowed Gross to call Agent Beyer as a witness and question her "in a very tailored and narrow way" to help the jury determine "whether a key cooperating witness testified falsely." App'x 3004. Agent Beyer testified that, while she did not recall the conversation, she would never have told Freundt to take a salary or bonus to which he was not entitled. However, she also stated that she told Freundt that Coin.mx was not being shut down at that point and that he was permitted to continue operating the business.

20

Defense counsel sought to ask Agent Beyer about her prior statement to the FBI, arguing that it contradicted her testimony, and to use the FBI report to refresh her recollection about whether Coin.mx was being shut down. The district court disallowed that questioning, finding no contradiction between Agent Beyer's testimony and her prior statement and concluding that such questions would be irrelevant to whether Freundt had lied in his testimony.

We review a district court's limitation on the scope of examination of witnesses for abuse of discretion. *In re Peters*, 642 F.3d 381, 389 (2d Cir. 2011) (per curiam). "As long as a defendant's right to confront the witnesses against him is not violated" a district court's decision to limit examination is not grounds for reversal. *United States v. Roldan-Zapata*, 916 F.2d 795, 806 (2d Cir. 1990). In particular, questioning is not "improperly curtailed if the jury is in possession of facts sufficient to make a discriminating appraisal of the particular witness's credibility." *Id.* (internal quotation marks omitted).

The district court did not abuse its discretion by restricting defense counsel's questioning of Agent Beyer. Freundt testified that Agent Beyer instructed him to pay himself salary and a bonus from Coin.mx's account. The purpose of calling

21

Agent Beyer was to impeach Freundt's testimony, and Agent Beyer unequivocally testified that she would not have instructed him to do this. Agent Beyer's statement to the FBI that she had not told Freundt to take money from Coin.mx's account does not contradict her testimony, and the court reasonably concluded that it was not necessary for the jury to learn of this statement to evaluate either Freundt's or Agent Beyer's credibility. We also agree with the district court that it was not necessary to clarify whether Coin.mx was being shut down for the jury to determine whether Freundt had testified truthfully about Agent Beyer's suggestion to take money from the Coin.mx account.

### d. Testimony about Insider Loans

Gross next contends that the government offered prior act evidence under Federal Rule of Evidence 404(b) without providing the required notice. Specifically, Gross points to testimony by two NCUA examiners that insider loans were taken out by Hope Cathedral, Gross, and a board member to cover negative share balances in the church's account at HOPE FCU. The district court overruled Gross's objection, finding that the testimony provided direct evidence of the crimes with which Gross had been charged.

Rule 404(b) allows evidence of a "crime, wrong, or other act" to be admitted if relevant, so long as it is not used as evidence of a character trait and that a person acted in conformity with that trait on a particular occasion. Fed. R. Evid. 404(b). The government must give "reasonable notice" to the defendant that it is offering prior act evidence under this Rule. Fed. R. Evid. 404(b)(2)(A). However, Rule 404(b) does not encompass acts that "arose out of the same transaction or series of transactions as the charged offense," are "inextricably intertwined with the evidence regarding the charged offense," or are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (internal quotation marks omitted).

Here, Gross was charged with conspiring to accept bribes as an officer of the credit union and disguising those bribes as "donations" to the Hope Cathedral account. The government's theory was that Gross used money from the Hope Cathedral account for his personal expenses, a theory he contested at trial. The jury was free to consider the challenged testimony to establish that Gross both deposited his own money into the account and received money from it personally.

23

Thus, this evidence was "necessary to complete the story of the crime[s] on trial." *See id.* (internal quotation marks omitted).

Accordingly, the district court did not abuse its discretion in concluding that this was not Rule 404(b) evidence and that the government was therefore not subject to the Rule's notice requirement.[6]

### 2. *Constructive Amendment or Variance of the Indictment*

Gross next contends that the evidence at trial so differed from the conduct for which he was indicted that it constructively amended the indictment. Specifically, Gross points to the indictment's omission of any mention of Kapcharge and its ACH transaction processing through HOPE FCU.

We review *de novo* a properly preserved claim that an indictment was constructively amended or prejudicially varied. *United States v. Dove*, 884 F.3d 138, 146, 149 (2d Cir. 2018).

---

[6] To the extent Gross argues that this evidence was used substantively for an impermissible "propensity" purpose, we reject this argument. To support his contention, Gross notes that the government referred to these loans as additional deceitful conduct for the court to consider at sentencing. But the purpose for which the evidence was used at sentencing is irrelevant to the purpose for which it was admitted at trial.

24

"A constructive amendment occurs when the charge upon which the defendant is tried differs significantly from the charge upon which the grand jury voted." *Id.* at 146. To succeed on such a claim, a defendant must demonstrate that "the proof at trial or the trial court's jury instructions so altered an *essential element* of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *Id.* (internal quotation marks omitted). We have "consistently permitted significant flexibility in proof, provided that the defendant was given *notice* of the *core of criminality* to be proven at trial." *United States v. D'Amelio*, 683 F.3d 412, 417 (2d Cir. 2012) (internal quotation marks omitted).

Gross was charged with receiving corrupt payments as an officer of a financial institution with the intent to be influenced in violation of 18 U.S.C. § 215(a)(2), as well as conspiracy to violate § 215(a), to make false statements to the executive branch in violation of 18 U.S.C. § 1001, and to obstruct the examination of a financial institution in violation of 18 U.S.C. § 1517. The conduct set forth in the indictment consists of Gross's agreement with Murgio, Lebedev, and the other Coin.mx agents to transfer control of the credit union in exchange for over

25

$150,000, including the $120,000 payment that the government later proved came from Kapcharge. The indictment further details Gross's efforts to mislead the NCUA about that transfer of power and about the credit union's financial health.

At the end of the trial, the district court instructed the jury as follows:

> Count One charges Yuri Lebedev and Trevon Gross with conspiring with others, from in or about April 2014 to in or about 2015, to achieve four unlawful objectives in an effort to further the operations of Coin.mx or the Collectables Club: Number one, to make corrupt payments to Trevon Gross with the intent to influence Trevon Gross in connection with the business of HOPE FCU; number two, to have Trevon Gross receive or agree to receive corrupt payments with the intent to be influenced in connection with the business of HOPE FCU; number three, to obstruct an examination of HOPE FCU by the NCUA; and number four, to make false statements to the NCUA in connection with the NCUA's examinations of HOPE FCU.

App'x 3947.

No constructive amendment occurred. The jury instructions described a conspiracy substantially the same as the one charged in the indictment. Moreover, the evidence at trial directly addressed the core of criminality charged in the indictment: Gross's conspiracy with Coin.mx to transfer control of the credit union in exchange for bribes and to evade the NCUA's scrutiny thereafter. The evidence and testimony about Kapcharge merely elaborated on how the

26

bribery conspiracy was accomplished; namely, that Murgio enlisted Kapcharge to pay the bulk of the bribes in exchange for access to a financial institution through which it could process ACH transactions.[7]

Gross contends, in the alternative, that the evidence about Kapcharge constituted a prejudicial variance from the conduct charged in the indictment. "A variance occurs when the charging terms of the indictment are left unaltered, but the evidence at trial proves facts materially different from those alleged in the indictment." *Dove*, 884 F.3d at 149 (internal quotation marks omitted). "[R]eversal is only warranted for a variance if the defendant shows both: (1) the existence of a variance, and (2) that substantial prejudice occurred at trial as a result." *Id.* (internal quotation marks omitted).

Gross contends he was prejudiced by the introduction of evidence about Coin.mx's conspiracy to operate an illegal Bitcoin exchange. But this evidence does not constitute a variance because Coin.mx's illegal Bitcoin exchange was charged in the indictment. Gross also argues the evidence about Kapcharge

---

[7] There was also no constructive amendment as to the misrepresentations to the NCUA. The misrepresentations presented to the jury were well within the allegations of obstruction in the indictment.

27

prejudiced him due to "unfair surprise" at trial because it involved alleged regulatory violations not identified in the government's bill of particulars. But this was not unfairly and substantially prejudicial. The government disclosed the evidence and exhibits concerning Kapcharge four weeks prior to trial, and much of this proof was the subject of motions in limine.

### 3. *Witness Intimidation*

Gross next contends that the government violated his right to present witnesses by intimidating other HOPE FCU employees to prevent them from testifying for him.

A group of former HOPE FCU board members and employees retained a single attorney to represent them in matters relating to this case. On March 1, 2017, the district court and counsel discussed which of the former board members Gross wished to call as witnesses. The purpose of that discussion was to determine whether any of those individuals were on the government's list of board members with potential criminal exposure, and thus would need independent representation to ensure counsel did not have conflicts. Gross's counsel asked if a person named Loretta Larkins was on the list. Although counsel for the

government initially indicated that she was, counsel almost immediately corrected this, saying, "[s]orry, I'm getting confused. Bernard Larkins. Loretta Larkins is not a board member."[8] App'x 2390.

The same day, the court ordered a hearing for March 3, 2017, requiring former board members who were potential witnesses to appear in court to consult with court-appointed counsel, and, if necessary, participate in a hearing to resolve whether their counsel had conflicts in representation. Despite the court's order, none of the former board members attended the March 3 hearing or indicated they were willing to testify.

On March 3, 2017, Gross indicated that he intended to call Loretta Larkins as a witness because, as bookkeeper for Hope Cathedral, she could testify about the separation between Gross's personal expenses and church expenses. The government recommended that Larkins would need independent counsel because she may have criminal liability, explaining that if Larkins testified about the church's payments for Gross's personal expenses, the government would cross-examine her on whether she reported these payments on tax returns she prepared

---

[8] Bernard Larkins was a member of the Board.

for Gross. The district court appointed independent counsel for Loretta Larkins. Ultimately, she did not testify.

To demonstrate a due process violation based on the government's intimidation of witnesses, the defendant must show three elements: (1) "that he was deprived of material and exculpatory evidence that could not be reasonably obtained by other means," (2) "bad faith on the part of the government," and (3) that "the absence of fundamental fairness infected the trial." *United States v. Williams*, 205 F.3d 23, 29 (2d Cir. 2000) (internal quotation marks omitted). The standard of review for such a decision on appeal is clear error. *United States v. Pinto*, 850 F.2d 927, 932 (2d Cir. 1988).

Gross's due process claim is meritless. First, Gross failed to show that Larkins was unable to testify because of government "intimidation," thus depriving him of material and exculpatory evidence. The government's only concern was that she be properly represented by unconflicted counsel. That legitimate concern did not prevent Gross from calling Larkins to testify. Nor does Gross show that the government acted in bad faith. The government's concern about former HOPE FCU board members' and employees' potential

30

criminal exposure arose in the context of determining whether the attorney for Hope FCU could represent them all without a conflict of interest, and the court order notifying them of the March 3 hearing addressed this concern. Although Gross contends that the government implicitly held the threat of prosecution over the former board members and Larkins to dissuade them from testifying, there is no evidence that the government's concern about their potential criminal exposure was designed to prevent Gross from calling witnesses in his defense.

Gross contends that the government acted in bad faith when it apparently changed its position about Larkins's criminal exposure between March 1 and March 3, 2017. The record does not support any such suggestion. On March 1, the government represented that Larkins was not on the list of board members with potential criminal exposure based on their knowledge of the payments to Hope Cathedral, because Larkins was not a board member. On March 3, the government represented that Larkins may have criminal exposure on a different basis—namely, that her anticipated testimony about Hope Cathedral's payments to Gross could expose her to criminal liability if it did not match the tax forms she had prepared on Gross's behalf.

\* \* \*

Because we find no error in the district court's evidentiary and constitutional rulings, we also reject Gross's contention that the cumulative effect of the court's errors was to deprive him of a fair trial. We affirm both Gross's and Lebedev's convictions.

### 4. *Gross's Sentence*

Finally, Gross challenges several aspects of his sentence. On November 16, 2017, Gross was sentenced principally to 60 months' imprisonment and three years of supervised release.

#### a. Appropriateness of Sentencing Enhancements

"We review the district court's interpretations of the Sentencing Guidelines de novo and its related findings of fact for clear error." *United States v. Cain*, 671 F.3d 271, 301 (2d Cir. 2012).

Gross first argues that the district court erred in applying a 4-level leadership enhancement under U.S.S.G. § 3B1.1 for "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The guidelines "only require that the defendant

32

be an organizer or leader of one or more of those participants for the section 3B1.1(a) enhancement to be appropriate." *United States v. Si Lu Tian*, 339 F.3d 143, 156 (2d Cir. 2003). Gross contends that the government failed to show that he was an organizer or leader.

At sentencing, the district court concluded that Gross supervised at least one other individual who processed ACH transactions, that he remained the chairman of the credit union even after the Coin.mx board members were elected, that he never relinquished his influence over the credit union, and that he was able to expel the Coin.mx agents from the credit union. Moreover, the court noted that Gross met repeatedly with the NCUA throughout the course of the conspiracy.

These factual findings by the district court are not clearly erroneous. As discussed above, the evidence at trial demonstrated that Gross was essential to the conspiracy to transfer control of the credit union to Coin.mx and to mislead the NCUA about that transfer of power.

Next, Gross contends that the district court erred in applying an enhancement under U.S.S.G. § 2B4.1 for commercial bribery that "substantially jeopardized the safety and soundness of a financial institution." U.S.S.G.

33

§ 2B4.1(b)(2)(B). A financial institution is considered "substantially jeopardized," if it "became insolvent" or "was placed in substantial jeopardy" of becoming insolvent. U.S.S.G. § 2B4.1 cmt. n.5.

The district court concluded at sentencing that Kapcharge's ACH transactions created a substantial risk of insolvency because, among other reasons, HOPE FCU was severely undercapitalized to support these transactions. This conclusion by the district court is also not clearly erroneous. Indeed, the evidence at trial demonstrated that Gross himself believed HOPE FCU had insufficient capitalization to support the volume of transactions that Kapcharge was processing.

Next, Gross challenges the district court's imposition of a two-level enhancement under U.S.S.G. § 3B1.3 for an abuse of a position of trust by use of a special skill "in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. A position of trust "is held by one who was accorded discretion by the victim and abused a position of fiduciary or quasi-fiduciary status." *United States v. Huggins*, 844 F.3d 118, 124 (2d Cir. 2016).

34

At sentencing, the district court determined that, among other things, Gross abused his position of trust toward the members of his credit union by allowing bribery payments to influence him to make decisions that jeopardized the credit union's financial health. This finding was not clearly erroneous. As discussed above, Gross's decision to allow Kapcharge to continue processing high volumes of ACH transactions put the credit union at significant risk of insolvency, which could have negatively affected the members.

### b. Restitution Order

Finally, Gross challenges the district court's order of restitution requiring him to pay $126,771.82 to the NCUA for the losses it incurred following the liquidation of HOPE FCU. We review orders of restitution for abuse of discretion. *United States v. Boccagna*, 450 F.3d 107, 113 (2d Cir. 2006). "To identify such abuse, we must conclude that a challenged ruling 'rests on an error of law, a clearly erroneous finding of fact, or otherwise cannot be located within the range of permissible decisions.'" *Id.* (quoting *United States v. Gonzalez*, 420 F.3d 111, 120 (2d Cir. 2005)).

The district court ordered restitution pursuant to 18 U.S.C. § 3663

35

and § 3663A. Gross's sole argument is that the NCUA's losses were caused in large part by conduct postdating the conspiracy for which he was convicted—namely, the credit union's continued processing of ACH transactions for Kapcharge.

At sentencing, in imposing restitution for NCUA's total losses, the district court found that,

> but for the bribery, which involved KapCharge, and pursuant to which Mr. Murgio and the Collectables Club facilitated unsafe volumes of ACH transactions at the credit union, the credit union would not ultimately have adopted a business model relying on fees from ACH transactions, would not have partnered with KapCharge and implemented unsafe ACH processes, would not have ended up in a state where all of its directors were ethically compromised, and would not have adopted a model incurring high and unsustainable operating costs. Additionally, I find that, but for the obstruction and false statement objects, the bribery would have been discovered, which would have both ended unsafe practices earlier and prevented the continuation of Gross and KapCharge's relationship, such discovery could have prevented the losses the NCUA ultimately sustained.

App'x 4059-60. These findings are not clearly erroneous. The district court was well within its discretion to conclude that HOPE FCU's financial difficulties proximately flowed from Coin.mx's bribery of Gross and the related processing of Kapcharge transactions.

36

### III. Conclusion

For the foregoing reasons, we **AFFIRM** the judgments of the district court.