11-3678-cr
United States v. Larry Corbett

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2013

(Argued: November 25, 2013          Decided: April 29, 2014)

Docket No. 11-3678-cr

─────────────────────────────

UNITED STATES,

*Appellee,*

─ v. ─

LARRY CORBETT,

*Defendant-Appellant,*

─────────────────────────────

Before: KATZMANN, *Chief Judge*, WINTER, CALABRESI, *Circuit Judges*.

Larry Corbett appeals his federal kidnapping conviction after bench trial in the District Court of Connecticut (Droney, *J.*). Corbett argues that the trial evidence was insufficient to prove that he "held" his kidnapping victim against the victim's will, as required by statute. We disagree. There was sufficient evidence to conclude that Corbett lured his victim into a van for the purpose of robbing him, and then kept the victim confined in the vehicle—whether by physical force, psychological intimidation, or trickery—

1

until Corbett had a chance to kill him. Corbett's remaining challenges are without merit. We, therefore, AFFIRM the kidnapping conviction and sentence.

H. GORDON HALL (Robert M. Spector, *on the brief*), Assistant United States Attorneys for David B. Fine, United States Attorney for the District of Connecticut, New Haven, CT, *for Appellee.*

CRAIG A. RAABE (Kori Termine Wisneski, *on the brief*), Robinson & Cole LLP, Hartford, CT, *for Defendant-Appellant.*

---

CALABRESI, *Circuit Judge*:

This case presents a question that is new to our circuit: what evidence is sufficient under the Lindbergh Law, 18 U.S.C. § 1201(a), to convict a defendant of "holding" a victim against the victim's will? Other circuits differ as to whether a defendant who first "takes" control of his victim by "decoy" or trick must intend to back up his pretense with physical or psychological force in order to "hold" the unwilling victim under the statute. *Compare United States v. Boone*, 959 F.2d 1550, 1555 & n.5 (11th Cir. 1992) (requiring that the defendant "ha[ve] the willingness and intent to use physical or psychological force to complete the kidnapping in the event that his deception fail[s]"), *with United States v. Hoog*, 504 F.2d 45, 50-51 (8th Cir. 1974) (finding the evidence to be sufficient where the defendant promised the victim a ride and then kept her in his car by inventing an emergency detour). We need not join either side of the split to decide this case. Here, the evidence was sufficient that Corbett, after tricking his victim into a minivan, intended to continue holding

2

the victim against his will—and so Corbett did—before robbing and killing the victim, and leaving his body along the road.

We therefore AFFIRM the kidnapping conviction and sentence of the District Court.

## I.  BACKGROUND

### A. Kidnapping and Homicide of George McPherson

The following facts, relevant to this appeal, are presented in the light most favorable to the Government. *See, e.g., United States v. Gaines*, 295 F.3d 293, 299-300 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

The morning of January 14, 2008, Larry Corbett borrowed his wife's minivan and drove from Bridgeport, Connecticut to the Bronx, New York, where Corbett planned to buy 27 pounds of marijuana from George McPherson for $27,000. Corbett had done business with McPherson before, albeit on a smaller scale. Corbett arrived at McPherson's house early, and McPherson suggested he get breakfast nearby while McPherson finished preparing the marijuana for sale. McPherson was stalling. In fact, according to Neville Fuller, who was with McPherson that morning, McPherson had not been able to round up what he had promised Corbett, and he was scrambling to locate more marijuana. By the time Corbett returned to McPherson's house, McPherson had managed to secure only about 9-10 pounds.

McPherson's habit was to conduct all drug business within his apartment, located in an attached townhouse on Tiemann Avenue, a dead-end residential street. Corbett, however, convinced McPherson to bring the marijuana out to Corbett's van, explaining that he "didn't feel safe coming to [McPherson's] house" because Corbett had seen two suspicious cars—one resembling an unmarked police car—parked on McPherson's block

3

near the wooded dead end. Carrying a duffle bag containing what Neville Fuller estimated to be between 9-10 pounds of marijuana, McPherson left his home and entered the minivan.[1] Fuller "peeped" out the second floor window to watch. Corbett's van was parked directly in front of McPherson's home, but facing away from the dead end so that the driver's side was on the left-hand side of the street, facing any oncoming traffic. Fuller described it as a "get away park," explaining that the van would not need to turn around at the dead end in order to "move out fast." A few seconds after his first peep, Fuller looked again, and the van was gone. Fuller testified that he had not heard any gunshots, squealing tires, argumentative voices, or slamming doors before the van drove off.

Around 11:20 a.m., a Greenwich, Connecticut resident reported finding McPherson's body dumped on the side of Sterling Road. She told police that the body had not been there when she left her home for a 10:30 a.m. exercise class. Home security camera footage caught Corbett's minivan backing down Sterling Road at 11:15 a.m. and driving off a minute later. McPherson had been shot twice in the back with a semi-automatic and robbed of his cell phones, wallet, and the duffel of marijuana.

Fifteen days later, Greenwich police arrested Corbett. Detective Timothy Hilderbrand told Corbett that his arrest was part of a homicide investigation, but did not mention McPherson's name. Corbett accompanied the officers to the Greenwich police station and, after waiving his Miranda rights, agreed to answer questions. Corbett gave the officers his background information, but when Detective Hilderbrand displayed

---

[1] Corbett, in his post-argument letter brief, asserts that there is "*no* evidence" that the duffle contained marijuana. Corbett's written statement—in which he describes McPherson bringing a "bag of weed" into the van and "checking out" McPherson's product—is more than sufficient for the fact finder's conclusion that the bag contained marijuana.

4

photographs of McPherson's body and Corbett's minivan on Sterling Road, Corbett said he thought he ought to get a lawyer.[2]  Substantive questioning ceased.  The officers asked Corbett if he had an attorney to call; finding he did not, they told Corbett that one would be appointed.

Officer Hilderbrand left the interrogation room to retrieve paperwork for booking Corbett.  Corbett and Detective Charlie Brown remained alone together.  Almost immediately, Corbett remarked on Brown's Masonic ring, which Brown had worn for the past 10 years.  Corbett revealed that his grandfather—who coincidentally shared Charlie Brown's name—was a Freemason and a mentor to Corbett.  Corbett asked Brown if he were "on the square," using a Masonic phrase by which members identify each other.  Brown responded affirmatively, and Corbett, who revered both his grandfather and the Masons, asked if he could call his grandfather.  Brown dialed the number Corbett dictated and passed him the receiver.  Making no effort to conceal his conversation, Corbett told his grandfather that he was speaking to a "Brother Mason" and needed advice; Corbett then passed the phone to Brown, saying his grandfather wanted to talk to the detective.

Brown explained that Corbett had been arrested for conspiracy to commit murder. Brown said that Corbett had invoked his right to silence and to an attorney, but that Brown just wanted to get Corbett's side of the story.  Before returning the phone to Corbett, Brown told Corbett's grandfather that he would "treat [Corbett] like a Brother Mason."  At the suppression hearing, Brown testified that he meant to convey that he would treat Corbett "with respect, dignity, honesty."  Corbett took back the receiver.  Again speaking in front of

---

[2] Neither side contests the validity of Corbett's Fifth Amendment counsel invocation, and Corbett dropped his Sixth Amendment challenge in the District Court.

5

Brown, Corbett confessed to his grandfather that he had made some "bad decisions," but insisted that he "did not kill that man." After hanging up, Corbett told Brown that he wanted to talk. The detectives reread Corbett his Miranda rights, and Corbett signed a second waiver.

Over the next couple of hours, Corbett gave oral and written statements, which acknowledged that he had persuaded McPherson to conduct the drug sale inside the minivan, but blamed McPherson's death on an unidentified shooter who robbed them while they were parked on Tiemann Avenue. According to Corbett, while he and McPherson checked out the duffle of marijuana, two men approached the van's driver side; one reached for a gun and demanded the cash. Corbett said that he threw $25,000 in bundled cash[3] at the robber and then "quick frisk[ed]" McPherson, discovering a revolver at McPherson's left waist. As Corbett and McPherson struggled for the gun, it discharged, hitting McPherson's hand. Meanwhile, the robber shot two or three times into the van, hitting McPherson in the back. Corbett said that he felt McPherson's body "go limp." Corbett "jump[ed] up quick" and peeled away from Tiemann Avenue.

Once he was sure that he was not being followed, Corbett pulled over to check on McPherson and realized he was dead. Corbett told the police that he tossed McPherson's wallet and cell phones along the road and left his body in a "deserted," wooded area. Corbett could not remember what became of McPherson's revolver. Although some aspects

---

[3] Corbett never addressed the discrepancy between the purchase price for McPherson's marijuana, $27,000, and the amount Corbett claimed to have brought with him on the day of McPherson's death, $25,000.

of the stories Corbett told Greenwich police differed, he remained adamant about two things: (1) that he had driven the van alone; and (2) that he did not kill McPherson.

## B. Procedural History

The case proceeded to a bench trial before then-District Judge Droney in Hartford, Connecticut. The District Court denied Corbett's motion to suppress his statements as involuntary. Although the Government did not present evidence identifying any accomplice of Corbett's, it did call Rayshawn Smith, who worked with Corbett as a nightclub bouncer. Smith testified that prior to McPherson's death, Corbett had recruited him to rob a Jamaican drug dealer in New York. According to Smith, Corbett let on that he knew the Jamaican dealer and had done business with him before, at the dealer's home. Corbett told Smith that he would call him prior to the robbery, and pick him up on the way to New York. Smith insisted that he believed Corbett was kidding around, and when confronted with evidence that Corbett additionally had, in fact, called Smith early on January 14—the day of McPherson's murder—Smith said he could not remember talking to Corbett on that date. There was no evidence that Smith, or any other particular individual, rode with Corbett to Tiemann Avenue, or helped Corbett carry out the robbery and homicide.

The court convicted Corbett of kidnapping resulting in McPherson's death (18 U.S.C. § 1201(a)(1)); felony murder (*id.* § 924(j)(1)); robbery (*id.* § 1951(a)); possession with intent to distribute marijuana (21 U.S.C. § 841(a)(1), (b)(1)(D)); and using a firearm during a drug trafficking crime (*id.* § 924(c)(1)(A)(iii)). Pursuant to Federal Rule of Criminal Procedure 23(c), the District Court issued written fact findings.

The District Court then sentenced Corbett to life imprisonment for kidnapping; life imprisonment for felony murder; 240 months for robbery; and 60 months for the drug charge, all to run concurrently. The court also sentenced Corbett to a mandatory consecutive term of 120 months for the gun charge, amounting to "life imprisonment plus ten years."

This timely appeal, in which Corbett raises several challenges to his conviction and sentence, followed. Because the Lindbergh Law mandates a sentence of life imprisonment or death when a kidnapper causes another person's death during the kidnapping, a key question before us is whether the evidence is sufficient to prove that Corbett "held" McPherson against his will, as required by § 1201(a)(1) of that law. We hold that it is. Essential to that analysis is the mens rea of the defendant—not the seeming consent of a deluded or coerced victim. Whether McPherson realized that he had been duped, or whether he died unaware of Corbett's betrayal, is beside the point. If Corbett intended to lure McPherson into his van, to drive him somewhere to be robbed and killed, and to dump his body in a "deserted" place, that is enough to satisfy the Lindbergh Law. The evidence was sufficient to show Corbett did just that. Because the evidence permitted the fact-finder to conclude that Corbett possessed the requisite culpability at each stage of the kidnapping, we uphold his conviction under § 1201(a). His remaining challenges lack merit. We, therefore, affirm the District Court.

8

## II. DISCUSSION

### A. Standard of Review

We review de novo a criminal defendant's challenge to the sufficiency of the evidence underlying his conviction. *See, e.g., United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999). We must draw all reasonable inferences in the Government's favor, and if we "conclude[] that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [we] must let the [fact-finder] decide the matter." *Id.* (internal quotation marks omitted); *see also McCarthy v. N.Y.C. Technical Coll.*, 202 F.3d 161, 166 (2d Cir. 2000) (same standard for bench trial). "The ultimate question is not whether *we believe* the evidence adduced at trial established defendant's guilt beyond a reasonable doubt, but whether *any rational trier of fact could so find.*" *United States v. Payton*, 159 F.3d 49, 56 (2d Cir. 1998) (emphasis original).

The federal kidnapping statute, also known as the Lindbergh Law, states:

> Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person . . . , when—(1) the person is willfully transported in interstate . . . commerce, regardless of whether the person was alive when transported across a State boundary . . . shall be punished . . . .

18 U.S.C. § 1201(a). Where "the death of any person results" during the kidnapping, § 1201(a) requires a sentence of life imprisonment or death. *Id.* The federal felony murder statute, under which Corbett was also convicted, allows imposition of a term shorter than life. *See* 18 U.S.C. § 924(j)(1) (allowing for punishment by "death or by imprisonment for any term of years or for life"). Accordingly, were we to overturn Corbett's kidnapping conviction, we would remand to the District Court to consider sentencing Corbett to a shorter term than "life imprisonment plus ten years." This is so despite the District Court's

9

imposition of a concurrent life sentence for felony murder, and its statement, at sentencing, that were it "not obligated to impose a mandatory term of life" under § 1201(a)(1), it did not believe the facts warranted either downward departure or a non-guidelines sentence. *See, e.g., United States v. Weingarten*, 713 F.3d 704, 712 (2d Cir. 2013) ("When part of a conviction is vacated and the case is remanded for resentencing . . . . [the district court] 'must reconsider the sentences imposed on each count, as well as the aggregate sentence.'") (quoting *United States v. Rigas*, 583 F.3d 108, 118 (2d Cir. 2009)).

## B. Section 1201(a)'s "hold" requirement

"[T]he kidnapping statute sets forth three elements of the crime: the victim must be unlawfully taken, coerced, or deceived into accompanying the accused nonconsensually; he or she must be held by the accused for ransom, reward or otherwise; and he or she must be transported in interstate or foreign commerce." *United States v. Macklin*, 671 F.2d 60, 65 (2d Cir. 1982) (footnote omitted). For this appeal, Corbett concedes that the evidence was sufficient to satisfy § 1201(a)'s first prong (for "inveigling" McPherson into the minivan) and third prong (for transporting him across state lines). He challenges only the District Court's conclusion on the second prong, arguing that there was insufficient evidence that Corbett "held" McPherson against his will.

Section 1201(a) plainly reaches a defendant who "seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away" his victim by deceit, as well as a defendant who uses physical or psychological force instead of trickery. § 1201(a). *See, e.g., United States v. Wills*, 234 F.3d 174, 176-79 (4th Cir. 2000) (luring a victim across state lines with a fake job advertisement in order to murder him is kidnapping under § 1201(a)); *Miller v. United States*,

10

138 F.2d 258, 260 (8th Cir. 1943) (affirming a § 1201(a) conviction where the defendant "decoyed" a victim by lying that he would take her to her dying grandfather and then enslaved her on a cotton farm).

Less clear is whether § 1201(a) covers a defendant who *continues* to use trickery to "hold" his victim captive, without resorting to physical or psychological coercion. *Cf. Miller*, 138 F.2d at 260 (finding that the victim was "kept . . . in servitude" by beatings and death threats once she realized her grandfather was not dying). This circuit has not addressed the question of whether a defendant may "hold" a victim by trickery alone. *Cf. Macklin*, 671 F.2d at 66-67 (rejecting the government's argument that defendant "induced" a runaway child to remain in New York, since the child "w[as] free to come and go as [he] pleased . . . and to leave [the defendant] at any time [he] wished . . . [as the child] did when he became so inclined").

The Fourth and Eleventh Circuits interpret § 1201(a)'s "hold" requirement to be satisfied when a defendant maintains control of his victim by continuing to employ a ruse, as long as the evidence shows that the defendant was willing and intended to use force to back up his deceit. *See, e.g., United States v. Higgs*, 353 F.3d 281, 313 (4th Cir. 2003) (concluding that the "hold" requirement was satisfied where a defendant lured victims into a van by promising them a ride home but detoured to a wildlife refuge where he executed them); *Boone*, 959 F.2d at 1556 (concluding that the "hold" requirement was met because the defendant's "deception" that he would bring a victim to a marijuana field was reinforced by his "apparent willingness to use force to keep [the victim] restrained"). As the *Boone* court wrote: "[W]here a kidnapper accompanies his inveigled victim, preserving the deception and

11

intending to use physical or psychological force if necessary, the volition of the victim is undermined beyond mere inducement by deception." *Boone*, 959 F.2d at 1557.

Other circuits have not followed the Fourth and Eleventh Circuits' seeming requirement of "decoy backed by force," deciding instead that continuing to "hold" the victim by trickery is sufficient. *See, e.g., United States v. Stands*, 105 F.3d 1565, 1569 (8th Cir. 1997) (affirming a § 1201(a) conviction where the defendant pretended a familial relationship with the victim and then lured the victim to a secluded spot on the pretext of looking at ancestral lands); *see also United States v. Carrion-Caliz*, 944 F.2d 220, 225-27 (5th Cir. 1991) (affirming a Hostage Act conviction but using § 1201(a) analysis where the defendant tricked his victims into a border house and then held them in the house by lying that they would be captured and deported if they ventured outside); *Hoog*, 504 F.2d at 48 (affirming a § 1201(a) conviction where the defendant tricked a victim by offering her a ride and kept her in his car by promising a job interview).

Focusing, as we do, on the defendant's intent, we need not, and hence, do not, decide today whether § 1201(a) may be satisfied when a victim is "held" only by the victim's continuing belief in his kidnapper's dupe. In this case, the Government produced sufficient evidence that Corbett intended to lure McPherson into his van for the purpose of robbing him; and that Corbett intended to "hold" McPherson in the van against McPherson's will.

Rayshawn Smith testified that Corbett invited him (facetiously, according to Smith) to rob a New York marijuana dealer with whom Corbett had previously done business and whose home he knew from prior deals. The Government presented evidence that Corbett had twice bought marijuana from McPherson in the months before the January 14

kidnapping—both times, according to the District Court, in McPherson's home. But, on this occasion, Corbett refused to do business inside McPherson's home and insisted that McPherson bring the drugs outside to the van (an irregular demand that "worried" Fuller).

There was also evidence that soon after McPherson brought the drugs into the van, Corbett drove off. In the minute or so between McPherson climbing in the van and the van leaving Tiemann Avenue, neither McPherson's neighbors nor Fuller (who kept lookout at the window) heard gunfire or fighting. McPherson's adult son, Sean, testified that his father's block of Tiemann Avenue was quiet, and that he had never heard gunfire there. Nor did the police turn up spent casings or other ballistic evidence of a shooting in front of McPherson's door. A rational fact-finder could have inferred that McPherson—who died from two semi-automatic wounds to the back—had not been shot until after he and Corbett left Tiemann Avenue.

Corbett is correct that the Government did not present evidence of what happened to McPherson inside the minivan between the time he left Tiemann Avenue, alive, and the time his body was dumped on the side of Sterling Road. Were we permitted to speculate, we might imagine any number of possibilities: Corbett might have kept McPherson in the van at gunpoint; Corbett might have deceived McPherson by saying that he would spare McPherson's life if McPherson could manage to round up the rest of the marijuana.[4] With McPherson dead and Corbett silent, it is impossible to know which of these or other things might have occurred. But the evidence presented nonetheless permits a fact-finder to conclude beyond a reasonable doubt, that Corbett *intended* to "take," "hold," and "transport"

---

[4] The District Court offered its view of the evidence by referring to an as-yet-undiscovered accomplice of Corbett's, to whom it referred as "Mr. X."

13

McPherson from New York to Connecticut, against McPherson's will, and that Corbett did so, causing McPherson's death along the way. This conclusion is all that is needed to support Corbett's kidnapping conviction and his mandatory life sentence.[5]

## C. Voluntariness of Corbett's Written and Oral Statements

Corbett also appeals the District Court's denial of his suppression motion, arguing that his oral and written statements to the Greenwich police were coerced in violation of his Fifth Amendment right against involuntary self-incrimination. *See United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011). Where a suspect waives his Miranda rights, as Corbett did, the Government must show, by a preponderance of the evidence, that the waiver was knowing and voluntary. *United States v. Murphy*, 703 F.3d 182, 192 (2d Cir. 2012). We review de novo the District Court's denial of a motion to suppress, accepting its factual findings unless clearly erroneous. *Id.* at 188. The question key to voluntariness is whether the subject's "will was overborne." *Plugh*, 648 F.3d at 128 (internal quotation marks omitted).

Corbett was twice warned of his Miranda rights, and twice waived them. Corbett's appeal primarily attacks his second waiver, which was obtained after Corbett called his grandfather. He argues that Detective Brown's assurance that he would "treat [Corbett] like a Brother Mason" was a promise of leniency that coerced Corbett into speaking. In *United States v. Gaines*, we distinguished between "unfulfillable promises or . . . misrepresentations," which "might render a confession involuntary," and "vague promises of leniency for

---

[5] Despite Corbett's argument to the contrary, it is well established that Congress may require mandatory minimum criminal sentences, including § 1201(a)(1)'s sentence of life imprisonment where the kidnapper causes any person's death. *See Chapman v. United States*, 500 U.S. 453, 467 (1991).

14

cooperation . . . [which] will not, without more, warrant a finding of coercion." 295 F.3d 293, 299 (2d Cir. 2002) (affirming conviction). The circumstances of Corbett's interrogation fit comfortably into the latter category.

Brown's Masonic ring piqued Corbett's interest. Had Corbett overlooked the ring or had his grandfather belonged to some other fraternal organization—say, the Elks club—perhaps Corbett would not have changed his mind about talking to the officers. Brown's membership in the Masons certainly meant something to Corbett, but contrary to his argument on appeal, the evidence suggests that Corbett was moved to cooperate, rather than coerced.

"Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities." *Plugh*, 648 F.3d at 125 (quoting *Oregon v. Elstad*, 470 U.S. 298, 308 (1985)). Having been warned previously, Corbett again was read his Miranda rights, and again waived them. In these circumstances, Corbett's change of heart must be deemed an "exercise [of] his own volition." *Id.*

### D. Admissibility of Minor's Testimony

Finally, Corbett challenges the District Court's decision to admit recorded testimony by his step-son, a minor.[6] Given the District Court's greater familiarity with the context in which the evidence is offered, we review such evidentiary decisions for abuse of discretion. *United States v. Robinson*, 702 F.3d 22, 36 (2d Cir. 2012).

Corbett argues that his step-son's testimony about seeing a semi-automatic weapon in Corbett's Bridgeport home was not probative, and constituted impermissible character

---

[6] Corbett does not object to admission of the recording itself, which Corbett requested in lieu of live testimony.

15

evidence. We disagree. The testimony is plainly relevant to Corbett's opportunity to get his hands on the kind of gun used to shoot McPherson, and to the question of the gun's whereabouts after McPherson was killed. Corbett's step-son told officers that he had accidentally discovered a semi-automatic in his parents' bedroom bureau. The child had come home from school and was looking for his video game system, which Corbett had confiscated as punishment. Corbett's step-son, who was thirteen at the time, told police that he could identify the gun as a semi-automatic because he "play[ed] a lot of *Call of Duty*," a police officer simulation game. Although he could not date his discovery of the semi-automatic, the child remembered seeing the gun a second time on the morning of Corbett's arrest, January 29, 2008. The boy saw Corbett drop a "black bag" on the table before running to the "mini-store" next to the family's home. When he peeked inside the bag, the child saw what he believed was the same semi-automatic and a small amount of marijuana. Corbett returned from the store and left with his bag. It is unclear whether the boy saw Corbett leave the house, or whether he assumed it; in any event, it was, he told the officers, the last time he saw his step-father.

It is true that this testimony neither established that the semi-automatic weapon seen by the minor belonged to Corbett, nor that this semi-automatic was the one that killed McPherson. But the evidence does show that Corbett had access to the type of weapon used to shoot McPherson, contrary to Corbett's statement to police that he had never possessed a gun or ammunition and that he had never kept a gun or ammunition in his home. Moreover, the boy's testimony places a semi-automatic in Corbett's control on January 29, 2008: the day of Corbett's arrest, and just fifteen days after McPherson's

16

murder—suggesting that the child's discovery of the semi-automatic, on an unspecified prior date, might well have been before or very near the day McPherson was shot. Admission of such evidence was well within the District Court's discretion.

### III.    CONCLUSION

Corbett's conviction and life sentence for causing George McPherson's death during the commission of a § 1201(a) kidnapping is AFFIRMED.