**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee*,

v.

JOHN MATTHEW CHAPMAN,

*Defendant - Appellant*.

No. 24-4939

D.C. No.
2:20-cr-00091-
JCM-DJA-1

OPINION

Appeal from the United States District Court
for the District of Nevada
James C. Mahan, District Judge, Presiding

Argued and Submitted January 7, 2026
San Francisco, California

Filed May 8, 2026

Before: Ronald M. Gould, Jacqueline H. Nguyen, and Mark
J. Bennett, Circuit Judges.

Opinion by Judge Gould

# SUMMARY[*]

## Criminal Law

The panel vacated John Chapman's conviction for kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) and remanded for a new trial.

The federal kidnapping statute has three primary elements, and four when death is alleged to have resulted from the kidnapping: (1) that the defendant "seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away" the victim; (2) that the defendant "holds" the victim; (3) that the victim is "willfully transported in interstate or foreign commerce" or that the defendant uses "any means, facility, or instrumentality of interstate or foreign commerce" in committing the kidnapping; and (4) that the kidnapping resulted in death.

Affirming the district court's denial of Chapman's post-verdict motion for acquittal, the panel held (1) the "holding" element of the federal kidnapping statute does not require a use of physical force, and an individual may be "held" against their will through a means of deception in an inveiglement case; and (2) there was sufficient evidence for a jury to conclude that Chapman "held" the victim by non-physical forms of "holding," including deception.

The panel vacated the conviction and remanded for a new trial, however, because, as the parties conceded, the district court improperly coerced the jury's verdict. First,

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the district court gave an *Allen* charge without disclosing to the parties that it had received on the first day of deliberations two substantive jury notes that contained the numerical breakdown of the jurors' votes. This was impermissible jury coercion. Second, the district court's comments when canvassing a juror were coercive under the totality of the circumstances. Third, the deliberation of only thirty minutes after receiving the *Allen* charge favors a finding of coercion. There were, finally, other indicia of coerciveness.

Affirming the district court's denial of his motion to suppress his confession, the panel held that Chapman knowingly and intelligently waived his *Miranda* rights and that his confession was voluntary.

## COUNSEL

Andrew C. Noll (argued), Trial Attorney, Appellate Section; Matthew R. Galeotti, Acting Assistant Attorney General; Criminal Division, United States Department of Justice, Washington, D.C.; Penelope J. Brady, Peter H. Walkingshaw, Megan Rachow, Adam M. Flake, and Steven J. Rose, Assistant United States Attorneys; Sigal Chattah, United States Attorney; Office of the United States Attorney, United States Department of Justice, Las Vegas, Nevada; for Plaintiff-Appellee.

Jeremy C. Baron (argued), Ellesse Henderson, and Nicholas Wolfram, Assistant Federal Public Defenders; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Defendant-Appellant.

**OPINION**

GOULD, Circuit Judge:

Appellant John Chapman ("Chapman") appeals the district court's denial of his post-verdict motion for acquittal, contending that there was insufficient evidence to convict and that the district court used an incorrect standard to determine if there was "holding" within the meaning of the kidnapping statute, 18 U.S.C. § 1201(a)(1). He also appeals his conviction for kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1), contending that a new trial is warranted because of improper jury coercion. Chapman also contends on appeal that the district court erred in its denial of his motion to suppress his confession because of an invalid waiver of Chapman's *Miranda* rights and that the district court erred in determining that his confession was voluntary. Finally, Chapman challenges the district court's issuance of particular jury instructions.

We have jurisdiction under 28 U.S.C. § 1291. Because the district court improperly coerced the jury's verdict, we vacate Chapman's conviction and remand for a new trial. We affirm the district court's denial of the motion for acquittal, however, and hold, for the first time in this Circuit, that the "holding" element of the federal kidnapping statute can be satisfied through non-physical force. Finally, we affirm the district court's denial of the motion to suppress and hold that Chapman knowingly and intelligently waived his *Miranda* rights and that his confession was voluntary.[1]

---

[1] Because the jury instruction concerning the meaning of "holding" within 18 U.S.C. § 1201(a)(1) is relevant to Chapman's claim there was insufficient evidence to convict, we address that jury instruction. But as

## I.  FACTS AND PROCEDURAL HISTORY

### A

Chapman suffers from autism, Tourette syndrome, Obsessive-Compulsive Disorder, and Attention Deficit Hyperactivity Disorder ("ADHD"), and he experienced language and other developmental delays while growing up. Chapman began a romantic relationship with Jamie Feden ("Feden") in 2009 that lasted on-and-off until her death in 2019.  Feden was born with VATER syndrome, a rare developmental syndrome which caused her to be small in stature, resulted in breathing issues, asthma, and eye problems, and prevented her from driving.  Chapman married another woman in 2018, unbeknownst to Feden, but continued a romantic relationship with Feden, unbeknownst to his wife.

In September 2019, Feden and Chapman took a road trip to Las Vegas, which they had been planning for almost a year.  Months before the trip, Chapman searched the internet for answers to questions about murdering an individual and disposing of the body.  Specifically, on June 23, 2019, Chapman viewed and followed a question on Quora, a website allowing individuals to post questions and answers, asking "[i]f I'm a suspect in a murder but a body is never found, can I be charged?"  On the same day, Chapman also interacted with a question reading "[y]ou have just murdered someone.  Where would you hide the body."  On August 12, 2019, Chapman interacted with a question asking whether an individual could be charged "if the police think something

---

to his other jury instruction challenges, we do not address them here because there will be a new trial and those other challenges can then be raised to the district court.

happened to my girlfriend" because she was reported missing and refused to speak or confirm anything with the police. Chapman also had viewed and followed questions about whether acid would dissolve human flesh and when a dead body would begin to float after drowning. On September 5, 2019, Chapman interacted with a question asking "[y]ou just murdered someone. Where would you hide the body?"

Days before leaving for Las Vegas, Chapman had mentioned to Feden that he wanted to rent a campsite for a few nights, but their discussion ended in argument when Feden said that she did not want to go camping because of their disputes. Chapman also said that he would move in with Feden after the camping trip if they had "a nice time" and did not argue.

Feden and Chapman began driving to Las Vegas on September 20, 2019. During three days of driving across the country, Feden told her friends that she and Chapman were considering moving to Las Vegas. They arrived in Las Vegas on September 23, 2019, and stayed in a hotel for two days. Also, on September 23, 2019, Chapman either made or interacted with several posts stating "[d]ump body Nevada,"; "[h]ow can I successfully dump a dead body without being caught?"; and "[y]ou have just murdered someone. Where would you hide the body."

On September 25, 2019, Feden and Chapman drove to a remote desert north of Las Vegas within Nevada. In his taped confession, Chapman said he told Feden they were just going for a drive. But, ending their drive, Chapman pulled off the road, zip-tied Feden's hands and feet to a signpost, and then put layers of duct tape over Feden's mouth and took photos. Chapman later put duct tape over Feden's nose, and

Feden soon died. After Feden died, Chapman cut her body from the zip ties, removed the tape and clothing from her body, and left her body in the desert. Feden's body was found ten days later by a car passing by and was originally declared a Jane Doe.

After the trip to Las Vegas and Feden's death, Chapman returned to Pennsylvania, went to Feden's home there, and sent messages from Feden's phone and online accounts. After a couple months, a neighbor became concerned about Feden because the neighbor saw only Chapman coming and going from Feden's home, but not Feden. The neighbor devised a ruse: the neighbor texted Feden asking about a red purse she said she had lent to Feden, although in reality there had been no such purse. The neighbor received a response from Feden's phone number saying that Feden no longer had the purse, which made Feden's neighbor suspicious.

Similarly, Feden's family and friends became concerned when they received text messages from Feden's phone number saying Feden no longer wanted to speak to them, but when they called Feden's phone number, no one answered. Like Feden's neighbor, one of Feden's friends devised a ruse and texted Feden's phone number that Feden's "Uncle Ralph" had died when Feden didn't have an Uncle Ralph. A person responded from Feden's phone number "I don't want to deal with it right now," which ignored that Feden had no "Uncle Ralph."

On November 15, 2019, an officer was dispatched to Feden's home at around 6:50 P.M. to perform a "check the welfare" at the residence after receiving concerned requests from Feden's friends and family. When the officer arrived at the residence, the officer found a bag with a roll of duct

tape and zip ties inside and saw Feden's cellphone on the counter.

Later between 12:40 A.M. and 2:00 A.M., Chapman spoke with the Bethel Park police station dispatch officer four times. The first two calls were initiated by Chapman, and the last two calls were initiated by the dispatch officer calling Chapman back. Chapman initially called the dispatcher and said that he received a message from his mother about Feden, that he was on his way to see Feden, and that Feden was okay. Chapman repeatedly said throughout the calls that he had spoken with Feden but alleged that Feden did not want to talk to her family or to Chapman. Chapman on these phone calls also repeatedly asked the dispatch officer if Chapman was in trouble or if there was a warrant out for his arrest.

During his fourth call with the dispatch officer, which occurred while Chapman was driving, Chapman was pulled over by the police near Feden's house and then taken back to the police station. At the police station, Chapman first sat in a room with Officer John Symsek for more than an hour while waiting for the Detectives to come in and begin questioning. During that period of time, Chapman asked Officer Symsek about *Miranda* rights, but Officer Symsek did not then read Chapman his *Miranda* rights.[2] Chapman was later questioned by Detectives Frank Marks and Giles Wright. Detective Wright told Chapman that Chapman was "not under arrest, not even being detained" and that they only wanted to "ask [him] a couple of questions." Detective Wright then read Chapman his *Miranda* rights, and

---

[2] Chapman's pre-*Miranda* statements made at the police station are not at issue on appeal because the government did not introduce or rely on this portion of the videotape.

Chapman signed a waiver, acknowledging that his *Miranda* rights were read to him and that he understood them. After signing the waiver but before the Detectives began questioning, Chapman disclosed his disabilities to the Detectives and told them "I don't want you to think that that means that I don't understand." Chapman then disclosed that he had also taken his medications that day.

During his questioning by the Detectives, Chapman confessed to killing Feden. While confessing, Chapman asked "if I come clean about everything, is there any way that I'm not going to get the death sentence." Detective Marks responded to Chapman that they would "help [him] out every way [they] can" and that "honesty goes a long way." Chapman then stated that he and Feden were on vacation in Las Vegas, when they drove north to do a "photo bondage shoot" when Chapman bound Feden and put tape over her face and nose. When asked why he killed Feden, Chapman said that it was for money and because he only wanted to be with his wife, but Feden had continued to ask Chapman why he wasn't around as often anymore. Chapman felt Feden's questioning had become more intense "over the past few months" before Las Vegas.

The Detectives asked Chapman many times if he had thought about killing Feden before they left for Las Vegas, to which he repeatedly answered in the affirmative. Chapman explained that he had purchased the zip ties and duct tape before leaving for Las Vegas and those were the same items found in his black backpack during the welfare check of Feden's home. Chapman at one point also asked whether this case would be subject to federal jurisdiction because "the plan was thought of in Pennsylvania and [he] traveled through several states."

At the end of the questioning by the Detectives, Chapman asked to speak with his mother and his wife, called both of them separately, and admitted during those calls, which were recorded, that "a little over a month ago" he "killed [Feden] . . . when [he] was in Nevada." Chapman showed the Detectives the place in the desert where he believed he left Feden's body and said that he removed Feden's clothes, the zip ties, and the tape after she died and then left her body without burying it.

**B**

Chapman was charged with a complaint and indicted by a grand jury on one count of kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1). Before trial, Chapman moved to suppress his confession, and the district court denied that motion after receiving a report and recommendation from a magistrate judge, who held a hearing on the issue.

Trial proceeded over eight days in April 2024. Chapman primarily contended at trial that his autism and other mental diagnoses led to deficits in his ability to read Feden's emotions and nonverbal communications, and that the bondage photoshoot in the desert presented a "perfect storm" for a mistake where Chapman could not identify the edge between fantasy and reality. To support this theory, and as relevant to this appeal, the defense primarily relied on the testimony of Dr. Christopher Boys, a pediatric neuropsychologist, who spoke primarily about Chapman's diagnoses of autism spectrum disorder, Tourette syndrome, and ADHD. Dr. Boys testified that, primarily due to his autism, Chapman would have had deficits in understanding non-verbal communication. Dr. Boys also testified about "theory of the mind," a concept in which a person can

understand the perspective and emotions of another person, and how Chapman would have lacked this skill because of his autism. Dr. Boys also testified that Chapman likely would not have good planning skills due to his ADHD. After the trial concluded and the jury left to deliberate, Chapman immediately moved for a mistrial, contending that the government misconstrued the "holding" element of the kidnapping statute. The district court denied the motion for a mistrial.

On the seventh day of trial, the jury began deliberations at 12:32 P.M. Before recess for deliberations, the district court told the parties that if there was a message from the jury or something else that the parties needed to see, then the court would reconvene; otherwise, the court instructed the parties to wait for the verdict. That same afternoon, the jury sent two substantive notes to the district court, which the district court neither read into the record nor disclosed to the parties. The first note said: "We have 10 juror[s] for guilty [and] 2 juror[s] for not guilty. Everyone is set in their conviction[s]. We have reviewed eviden[ce] and discuss[ed] [the] situation at length. How do we move forward?" The second note said: "We are still undecided! How do we proceed?" The district court did not respond to the jurors or disclose the existence of these two notes to the parties. Instead, at 4:44 P.M. that day, the district court called the parties back into the courtroom and told the parties that the district court planned to ask the jury foreman whether the jury was close to reaching a verdict, which the court said it did not believe they would be. The district court then repeated that it did not want to "strong-arm" the jury into a verdict. When the jury returned to the courtroom, the district court made it clear that the district court was going to send the jury home for the day rather than keeping the jury late

for deliberations because the court did not "want [the jury] to compromise" on their sincerely held beliefs. The district court did not tell the parties that it had received any substantive notes from the jury that day.

On the eighth day of trial, deliberations continued. Again, the district court received notes from the jury, including one note from Juror Number 4 that stated: "Do I have to consider the defendant's mental disabilities to give my verdict? Or just to put aside his disabilities and say 'guilty or not guilty'?" Other notes asked whether a juror can "base their bias" off of Chapman's "'disability' solely"; asked whether jurors are able to get a copy of their answers to questions during jury selection, particularly the questions as to individuals' biases; and asked whether Chapman had a competency hearing and whether he passed that hearing. The flurry of questions from the jurors both on day one and day two of the jury deliberations illustrate that the jury was unsure whether to convict Chapman.

Before calling the jury back into the court room to discuss these questions, the district court incorrectly told the parties that these questions from the second day of deliberations "[we]re the first substantive" questions received from the jury. Both parties told the court that the jurors and the court should only communicate on such questions through writing and that "having a question-and-answer session orally is not proper," but the district court nonetheless brought the jury into the courtroom to discuss the questions in person. The district court told the jury that the jury must base its decision solely on the evidence received in the case.

After the jury was dismissed, the jury sent another note to the court stating: "There is one juror that would like to be

replaced by the alternate. Is that an option? Due to the juror using biased opinion." Chapman's counsel suggested that the district court canvass the juror who wanted to be replaced. When the jury reentered, the district court first asked the jury foreman to identify the juror at issue. The foreman indicated Juror Number 11, and the district court immediately asked Juror Number 11, "[s]o you can't follow the instructions of the [c]ourt?" Juror Number 11 explained that the juror was not basing the juror's holdout vote on personal feelings but rather was "following the evidence," particularly the testimony of Dr. Boys.

The district court continued to intensely question Juror Number 11, asking whether Juror Number 11 was suggesting that the foreman was "just making . . . up" that Juror Number 11 was basing the holdout vote on personal feelings and questioned Juror Number 11 about the specific testimony of Dr. Boys. When Juror Number 11 tried to say that Dr. Boys explained that autistic individuals sometimes cannot interpret nonverbal communication, the court told Juror Number 11, "[s]ee but that's irrelevant. That's irrelevant. It doesn't matter . . . It's not like you've gotta follow that."

Juror Number 11 tried to respond, explaining that expert testimony is evidence as explained by the court, but the court replied:

> [B]ut when it conflicts with the instructions I give you, you need to follow the instructions I give you, not -- not go off and say, "Well, wait, one of the witnesses" -- I mean, and I can't control the witnesses. I don't know what they may say. But we can't just say,

"Well, that witness said blah, blah, blah and
so I can't -- I can't deliberate."

After this exchange, Juror Number 11 thanked the court, and
the court repeated that Juror Number 11 would "have to
surrender that opinion" and would have to base the verdict
decision "[o]n the evidence and not on something you
remember some doctor said."

After the jury was dismissed, the defense orally moved
again for a mistrial. The district court acknowledged it
"spoke too broadly" and that Dr. Boys' testimony was
evidence. The jury left the courtroom at 2:16 P.M.,
deliberated for thirty-seven minutes, and then reentered the
courtroom at 2:53 P.M. with a unanimous guilty verdict for
kidnapping resulting in death.

After the jury verdict, Chapman moved for a judgment
of acquittal under Federal Rule of Criminal Procedure
("Rule") 29 and moved for a new trial under Rule 33. The
district court denied both motions. Chapman timely
appealed.

## II.   STANDARD OF REVIEW

"We review *de novo* whether a judge has improperly
coerced a jury's verdict, [which is] a mixed question of law
and fact." *United States v. Sproat*, 89 F.4th 771, 775 (9th
Cir. 2023) (emphasis added).

We also review *de novo* the sufficiency of the evidence
for a conviction. *United States v. Gonzalez*, 528 F.3d 1207,
1211 (9th Cir. 2008). In conducting this review, we consider
"the evidence presented at trial in the light most favorable to
the prosecution." *United States v. Nevils*, 598 F.3d 1158,
1164 (9th Cir. 2010) (en banc). Then, we "determine

whether this evidence, so viewed, is adequate to allow '*any* rational trier of fact [to find] the essential elements of the crime beyond a reasonable doubt.'" *Id.* (alteration and emphasis in original) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).

"We review a district court's ruling on a *Miranda* waiver under two standards: Whether the waiver was knowing and intelligent is a question of fact that we review for clear error. Whether the waiver was voluntary is a mixed question of fact and law, which we review *de novo*." *United States v. Amano*, 229 F.3d 801, 803 (9th Cir. 2000) (emphasis added).

## III.  DISCUSSION

### A

Although both parties concede that we should vacate the conviction and remand for a new trial due to jury coercion, we must first address Chapman's challenge to the denial of his Rule 29 Motion for Judgment of Acquittal and his challenge to the sufficiency of the evidence to convict. We address these issues first because if we were to conclude that Chapman was entitled to acquittal as a matter of law, there could be no remand for a new trial, even if there were a basis for a new trial due to jury coercion. *See, e.g.*, *United States v. Williams*, 547 F.3d 1187, 1195–99, 1202–07 (9th Cir. 2008) (first holding there was sufficient evidence to convict and then ordering a new trial due to a coercive *Allen* charge); *United States v. Steel*, 626 F.3d 1028, 1029 (9th Cir. 2010) ("[W]e reversed that conviction and remanded the case for a new trial because, *although the evidence was sufficient to convict [defendant] on Count One . . .* the jury had improperly received an *Allen* charge." (emphasis added) (citing *Williams*, 547 F.3d at 1195–97, 1206–07)); *see also United States v. Bibbero*, 749 F.2d 581, 586 (9th Cir. 1984)

("An appellate reversal of a conviction on the basis of insufficiency of the evidence has the same effect as a judgment of acquittal: the Double Jeopardy Clause precludes retrial . . . [and thus,] [t]he existence of other grounds for reversal does not avoid the necessity of reviewing the sufficiency of the evidence."); *United States v. Szado*, 912 F.2d 390, 393 (9th Cir. 1990) (holding that the district court was required to rule on the sufficiency of the evidence prior to remanding the case to a magistrate judge for a new trial even when the new trial was warranted on other grounds). We hold that there was sufficient evidence to convict Chapman and that he is not entitled to acquittal as a matter of law.

Chapman contends that the government and the district court legally erred in interpreting the federal kidnapping statute to allow the second element of "holding" to be satisfied by "deception alone," and that there was not sufficient evidence to support a conviction under the federal kidnapping statute. Chapman also contends that the district court erred when it provided a jury instruction that allowed the "holding" element to be satisfied by deception.

The federal kidnapping statute has three primary elements, and four when death is alleged to have resulted from the kidnapping: (1) that the defendant "seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away" the victim; (2) that the defendant "holds" the victim; (3) that the victim is "willfully transported in interstate or foreign commerce" or that the defendant uses "any means, facility, or instrumentality of interstate or foreign commerce" in committing the kidnapping; and (4) that the kidnapping resulted in death. 18 U.S.C. § 1201(a)(1). The parties dispute the meaning of the second element— "holding"—and ask us to address for the first time in this

Circuit whether the "holding" element can be satisfied through non-physical force such as deception.

We have not yet in this Circuit explicitly addressed the meaning of "holding" in an "inveiglement" kidnapping case. *See, e.g.*, *United States v. Redmond*, 803 F.2d 438, 439 (9th Cir. 1986) (recognizing that the defendant originally inveigled the victim, but later held the victim through force); *but see United States v. Garcia*, 854 F.2d 340, 345 (9th Cir. 1988) (finding that a co-defendant was a conspirator to kidnapping when she "aided in holding" the victim by psychologically terrorizing the victim). We now join our sister Circuits who have addressed the issue before us, and hold that the federal kidnapping statute does not require a use of physical force and that an individual may be "held" against their will through means of deception in an inveiglement case.

We begin with guidance from the Supreme Court. In *Chatwin v. United States*, 326 U.S. 455 (1946), the Supreme Court reversed a federal kidnapping conviction because the Court found that the "holding" element of the federal kidnapping statute could not be satisfied when the victim of the alleged kidnapping was not held against her will but instead voluntarily chose to remain with the defendant. *Id.* at 459–60. In so holding, the Supreme Court recognized that the "holding" element does not require detainment through use of force; instead, the Court recognized that the subject of the alleged kidnapping could have been "held" through fear or deception. *Id.* at 460. The Court stated: "There is no proof that Chatwin or any of the other petitioners willfully intended through force, *fear or deception* to confine the [subject of the alleged kidnapping] against her desires." *Id.* (emphasis added).

Circuits that have since resolved whether the "holding" element requires the use of physical force have interpreted the *Chatwin* Court's language that holding may be through "force, fear[,] or deception" to mean that the holding element does not require a use of physical force. For example, the Eleventh Circuit held that the federal kidnapping statute "can be violated without the use of physical force." *United States v. Gillis*, 938 F.3d 1181, 1209 (11th Cir. 2019); *see id.* (collecting cases). Similarly, the Fourth Circuit has expressly held that both elements ("taking" and "holding") of the federal kidnapping statute can be "committed without violence." *United States v. Walker*, 934 F.3d 375, 379 (4th Cir. 2019); *see also United States v. Wills*, 234 F.3d 174, 177 (4th Cir. 2000) ("By its terms, § 1201(a) criminalizes kidnappings accomplished through physical, forcible means and also by nonphysical, non-forcible means."); *United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983) (finding misrepresentations to be sufficient to "exercise[] control over" the actions of the victim and constitute "holding").

And the only other Circuits to directly address the issue—the Fifth and Eighth Circuits— have long held that restraining or holding a person against her will does not require the use of physical force. *See United States v. Carrion-Caliz*, 944 F.2d 220, 225 (5th Cir. 1991) ("[N]on-physical restraint[,] for instance, fear or deception[,] can be sufficient to restrain a person against her will."); *United States v. Hoog*, 504 F.2d 45, 50–51 (8th Cir. 1974) (holding that a defendant "lur[ing] or entic[ing]" the victims "by false promises" "to stay in the vehicle" was sufficient for a kidnapping conviction); *but see United States v. Corbett*, 750 F.3d 245, 251 (2nd Cir. 2014) ("[W]e need not, and hence, do not, decide today whether § 1201(a) may be satisfied

when a victim is 'held' only by the victim's continuing belief in his kidnapper's dupe.").

We join these Circuits and hold that an individual may "hold" another, as that term is meant in the federal kidnapping statute, through non-physical means in inveiglement cases. This interpretation harmonizes our Circuit with other Circuits that have resolved this issue and remains faithful to Supreme Court precedent. *See Chatwin*, 326 U.S. at 460 ("The act of holding a kidnapped person . . . necessarily implies an unlawful physical *or mental restraint* for an appreciable period against the person's will and with a willful intent so to confine the victim." (emphasis added)).[3]

We conclude that in reviewing the sufficiency of the evidence, there was sufficient evidence for a jury to conclude that Chapman "held" Feden by non-physical forms of "holding," including deception. Here, Chapman told Feden that he would move in with her after the camping trip in Las Vegas if they had "a nice time" and did not argue. Feden's continued belief in this deception—Chapman admitted he thought about killing Feden in Las Vegas prior to the trip— was enough for a jury to conclude that Chapman held Feden captive in Las Vegas.

For the same reasons, there was also sufficient evidence that Chapman "took" through inveiglement and decoy. The record showed that Chapman interacted with or created internet searches indicating that he was contemplating killing Feden long before their trip to Las Vegas, and that

---

[3] Because we hold that evidence of "mental restraint" or "deception" is sufficient to establish holding for the federal kidnapping statute, the district court did not err when it instructed the jury that "deception can be sufficient to restrain a person against her will." We therefore reject Chapman's challenge to the jury instructions on this basis.

Chapman confessed that he devised his plan to kill Feden while in Pennsylvania. A reasonable juror could conclude that this evidence is sufficient to show that Chapman "took" Feden by decoy, and that his continued use of deception throughout the trip "held" Feden against her will. *See Nevils*, 598 F.3d at 1164 (holding that evidence must be sufficient to allow any rational trier of fact to convict).

Also, there was evidence that Chapman drove Feden from Pennsylvania to Las Vegas and used both phones and cars as instrumentalities of commerce even within the intrastate trip to the desert. *See United States v. Oliver*, 60 F.3d 547, 550 (9th Cir. 1995) (holding "cars are themselves instrumentalities of commerce"). Finally, there was sufficient evidence that Feden's death was caused by the kidnapping. *See United States v. Rodriguez-Moreno*, 526 U.S. 275, 281 (1999) ("A kidnap[p]ing, once begun, does not end until the victim is free.").

We hold that there was sufficient evidence presented to permit a rational trier of fact to conclude that the essential elements of kidnapping resulting in death under 18 U.S.C. § 1201(a)(1) had been proved beyond a reasonable doubt and thus Chapman is not entitled to acquittal as a matter of law. However, Chapman is entitled to a new trial because of our next holding that there was impermissible jury coercion.

**B**

A criminal defendant "being tried by a jury is entitled to the uncoerced verdict of that body." *Lowenfield v. Phelps*, 484 U.S. 231, 241 (1988). That right is not automatically violated when a district court gives an *Allen* charge, which is a supplemental jury instruction aimed at encouraging a jury to reach a verdict when the jury appears deadlocked. *See Allen v. United States*, 164 U.S. 492, 501–02 (1896).

However, an *Allen* charge is improperly coercive "where it's clear from the record that the charge had an impermissibly coercive effect on the jury." *Williams*, 547 F.3d at 1205 (quoting *United States v. Banks*, 514 F.3d 959, 974 (9th Cir. 2008)). To determine whether a charge given to a jury is coercive, we examine the "totality of the circumstances," including: (1) "the form of the instruction"; (2) "the time the jury deliberated after receiving the charge in relation to the total time of deliberation"; and (3) "any other indicia of coerciveness." *United States v. Berger*, 473 F.3d 1080, 1090 (9th Cir. 2007) (first quoting *Jiminez v. Myers*, 40 F.3d 976, 980 (9th Cir. 1994) (per curiam), and then quoting *United States v. Steele*, 298 F.3d 906, 911 (9th Cir. 2002)); *see also Lowenfield*, 484 U.S. at 240 ("We are mindful that the jury returned with its verdict soon after receiving the supplemental instruction, and that this suggests the possibility of coercion."); *Locks v. Sumner*, 703 F.2d 403, 406–07 (9th Cir. 1983) ("[T]he inquiry by the judge must be viewed in light of the context in which it was made, not in isolation."). And, in examining the trial court's statements to a holdout juror, we consider whether the statements "would be likely to coerce certain jurors into relinquishing their views in favor of reaching a unanimous decision." *Jiminez*, 40 F.3d at 979 (quoting *Locks*, 703 F.2d at 406).

As Chapman and the government concede on appeal, the district court's interactions with the jury were undoubtedly coercive. First, the district court did not disclose to the parties the jury's two substantive notes received by the district court on the first day of deliberations. These notes

contained the numerical breakdown of the jurors' votes, a fact that was not told to the parties.[4]

We have previously held that giving an *Allen* charge while knowing the numerical breakdown of the jury's votes is "per se coercive and requires reversal."[5]  *See Williams*, 547 F.3d at 1205 (quoting *United States v. Ajiboye*, 961 F.2d 892, 893–94 (9th Cir. 1992)); *see also Ajiboye*, 961 F.2d at 894 ("Even when the judge . . . is inadvertently told of the jury's division, reversal is necessary if the holdout jurors could interpret the charge as directed specifically at them— that is, if the judge knew which jurors were the holdouts *and* each holdout juror knew that the judge knew he was a holdout." (emphasis in original)).  The district court knew the breakdown of jurors' votes from the jury notes it received on the first day, yet the district court did not disclose these substantive notes to the parties before the district court gave its *Allen* charge.  The notes were not disclosed until after the verdict was reached.  This was impermissible jury coercion.

Second, the district court's comments when canvassing Juror Number 11 were coercive under the "totality of the

---

[4] Instead, the district court affirmatively told the parties at the end of the first day of deliberations, "[s]o far no questions [from the jury], so we're good," and the parties were only able to first access these notes as they were preparing for this appeal.

[5] Although the district court said that it did not intend to give an *Allen* charge, whether an *Allen* charge was in fact given "depends on the circumstances under which the supplemental instruction is given and the content of the instruction."  *Williams*, 547 F.3d at 1204.  Here, given the total circumstances, we consider the district court's actions on the second day of deliberations to be an *Allen* charge in substance.  And the fact that the district court gave this charge, while knowing the numerical breakdown of the jurors' votes, is sufficient to render it coercive under our precedent.

circumstances." *See Berger*, 473 F.3d at 1090 (quoting *Jiminez*, 40 F.3d at 980). "[T]he form of the instruction" was coercive because the district court explicitly told Juror Number 11 to "surrender that opinion," that the evidence on which Juror Number 11 was relying was "irrelevant," and that the evidence Juror Number 11 was considering "doesn't matter." *See id.* We have previously held that directing a jury to focus on certain portions of evidence is coercive, just as is disparaging or minimizing evidence that a juror says they are relying upon. *See Smith v. Curry*, 580 F.3d 1071, 1082 (9th Cir. 2009); *see also Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam) (holding that trial court's charge that "[y]ou have got to reach a decision in this case" was sufficient to find jury coercion).

"[T]he time the jury deliberated after receiving the charge" also favors a finding of coercion. *Berger*, 473 F.3d at 1090 (quoting *Steele*, 298 F.3d at 911). After being deadlocked for two days during deliberations, the jury spent only thirty-seven minutes deliberating after the district court's charge before swiftly returning with a unanimous guilty verdict. We have repeatedly held that a short time frame for deliberations after an *Allen* charge indicates coercion. *See Smith*, 580 F.3d at 1083–84 (holding that deliberations for "only slightly longer than one hour" after an *Allen* charge was sufficient to support our conclusion that the district court coerced a jury verdict and that a new trial was warranted); *United States v. Evanston*, 651 F.3d 1080, 1083, 1093 (9th Cir. 2011) (holding a new trial was necessary where the jury had deliberated for two hours after receiving an *Allen* charge and hearing supplemental arguments); *United States v. Contreras*, 463 F.2d 773, 774 (9th Cir. 1972) (per curiam) (jury deliberation for thirty-five minutes after an *Allen* charge supported coercion and

warranted a new trial). Here, deliberation for only thirty-seven minutes after the *Allen* charge was given fits comfortably within the range of durations considered coercive in our precedent.

Finally, there are "other indicia of coerciveness." *Berger*, 473 F.3d at 1090 (quoting *Steele*, 298 F.3d at 911). One is that the district court directed its comments at a specific juror identified as a holdout in one of the juror notes received. A second is that the district court knew which individual jurors held certain views, and a third is that the jury was deadlocked when the district court gave its supplemental *Allen* charge. These facts favor a new trial based on a conclusion that the swift jury verdict was reached because of jury coercion. *See id.* at 1093. We hold that the district court improperly coerced the jury's verdict, and so we vacate the verdict and remand for a new trial.

## C

Finally, we hold that Chapman validly waived his *Miranda* rights, and that his statements made after he waived his *Miranda* rights during the Detectives' questioning were voluntary. We follow our Circuit's rule that "[w]hether there has been a valid waiver depends on the totality of the circumstances, including the background, experience, and conduct of defendant." *United States v. Rodriguez-Preciado*, 399 F.3d 1118, 1127 (9th Cir. 2005) (quoting *United States v. Doe*, 155 F.3d 1070, 1074 (9th Cir. 1998) (en banc)). In determining whether a waiver was "knowing" and "intelligent," we consider:

> (i) the defendant's mental capacity;
> (ii) whether the defendant signed a written waiver; (iii) whether the defendant was

advised in his native tongue or had a translator; (iv) whether the defendant appeared to understand his rights; (v) whether the defendant's rights were individually and repeatedly explained to him; and (vi) whether the defendant had prior experience with the criminal justice system.

*United States v. Crews*, 502 F.3d 1130, 1140 (9th Cir. 2007). Considering these factors, the district court did not clearly err in concluding that Chapman's *Miranda* waiver was knowing and intelligent. Although Detective Wright read Chapman his *Miranda* rights quickly in a quieter tone than Detective Wright had used earlier and testified that he had told Chapman that Chapman was not under arrest and that the *Miranda* warnings were "protocol," Chapman nonetheless seemed to understand what his *Miranda* rights were and he ultimately signed the waiver.

Chapman brought up his *Miranda* rights several times before they were read to him, and Chapman had completed a prior federal sentence for federal wire fraud and identity theft charges, so he was clearly not without "prior experience with the criminal justice system." *See id.* Chapman also signed a written waiver of those rights. *See id*; *see also Derrick v. Peterson*, 924 F.2d 813, 824 (9th Cir. 1991) ("The written waiver in particular is strong evidence that the waiver was valid."), *overruled on other grounds by United States v. Preston*, 751 F.3d 1008 (9th Cir. 2014) (en banc).

And although we have recognized that mental capacity of an individual undoubtedly can impact the voluntariness of a *Miranda* waiver, we are not persuaded that Chapman's mental diagnoses impacted his understanding in this case. *Cf., e.g.*, *Doody v. Ryan*, 649 F.3d 986, 1002–03 (9th Cir.

2011) (en banc) (finding *Miranda* waiver invalid when the detective failed to advise juvenile of right to counsel, deviated from the written juvenile *Miranda* form when reciting the rights, and the detective misstated the rights by describing them as a formality to "a juvenile, who had never heard of *Miranda*"). Chapman, unprompted, had told the Detectives of his mental diagnoses of Tourette syndrome, ADHD, and autism, but assured Detective Wright that he understood what was happening when he waived his rights, and he had also said that he took his medication that day. We conclude that, under the totality of circumstances, the district court did not clearly err in holding Chapman's *Miranda* waiver to be knowing and intelligent.

Moreover, the district court did not err in concluding that Chapman's post-*Miranda* statements were voluntary. A confession is considered involuntary if "the government obtained the statement by physical or psychological coercion or by improper inducement." *United States v. Male Juv.*, 280 F.3d 1008, 1022 (9th Cir. 2002) (quoting *Derrick*, 924 F.2d at 817). To find coercion, we must determine that the "defendant's will was overborne" by the coercive circumstances of the interrogation. *Preston*, 751 F.3d at 1016. Coercion can be found either as a result of "physical intimidation or psychological pressure." *Brown v. Horell*, 644 F.3d 969, 979 (9th Cir. 2011); *see also Colorado v. Connelly*, 479 U.S. 157, 164–65 (1986).

Chapman contends that Detective Marks' comment that the Detectives would "help [him] out every way [they] can" in response to Chapman's question "if I come clean about everything, is there any way that I'm not going to get the death sentence?" was impermissibly coercive by promising leniency. Again, we are not persuaded that the facts of this case are similar to the coercive tactics we have previously

found to overcome a defendant's will. *See, e.g.*, *Preston*, 751 F.3d at 1020–28 (holding the defendant provided involuntary statements when the defendant had a very low IQ, exhibited "significant deficits in mental functioning" during the questioning, and the interrogating detectives told the defendant that his confession was "just an apology note," which would not be shared with anyone else).

Chapman's confession, by contrast, lasted only a few hours in total, all individuals maintained a relatively calm demeanor, and Chapman, himself, seemed to offer up various parts of the confession. And for the reasons stated above, Chapman's mental diagnoses did not cause him to be susceptible to coercion during the Detectives' questioning. Chapman explained his disabilities in detail, assured the Detectives he understood what was happening while he was being questioned, and knew details about the consequences of the crime to which he admitted. These circumstances do not persuade us that Chapman's will was overborne by the Detectives or that the circumstances otherwise show that his statements were involuntary.

Instead, the Detectives' comments that they would "help [him] out every way [they] can" and that "honesty goes a long way" did not overbear Chapman's will nor render the confession involuntary. *See United States v. Harrison*, 34 F.3d 886, 891 (9th Cir. 1994) ("[I]n most circumstances, speculation that cooperation will benefit the defendant or even promises to recommend leniency are not sufficiently compelling to overbear a defendant's will."); *see also Balbuena v. Sullivan*, 980 F.3d 619, 633–34 (9th Cir. 2020) (finding confession voluntary when "video recording reveal[ed] that the tone of the interview was non-threatening," the defendant "spoke easily with the detectives" and "displayed a calm demeanor with no

indication of fear or intimidation," the interview lasted an hour and a half, and the same two detectives conducted the entire interview).

## IV. CONCLUSION

We VACATE Chapman's conviction and REMAND to the district court for a new trial.